[Crim. No. 25823. Second Dist., Div. One. Nov. 24, 1975.]

In re ROGER G., A Person Coming Under the Juvenile Court Law.
KENNETH E. KIRKPATRICK, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
ROGER G., Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, John J. Gibbons and Jo Kaplan, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Russell Iungerich and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**THOMPSON, J.**—Based upon somewhat equivocal eyewitness testimony, his possession of a .38 caliber pistol that ballistics testimony concluded had a "50-50" possibility of having fired a fatal bullet, and his confession. Roger G. was adjudicated a ward of the juvenile court by reason of having committed murder. Because uncontradicted facts establish that Roger's confession was involuntary, we reverse the adjudication.

Grace Capistrano was shot to death in the parking lot of Centinela Community Hospital on the night of March 22, 1973. Roger was arrested for the crime and interrogated by the Inglewood police on September 5. Included as a settled statement on appeal is a transcription of a tape recording of Roger's confession given in the course of that interrogation.

The first 15 pages of the transcript disclose Roger's effort to avoid confessing to the crime and claim an inability to remember. The interrogating officer then asked: "How old are you? Sixteen? Seventeen? Seventeen?" and then added: "You know you could be in jail until you are about twenty-five. That's a long time." Another officer interjected: "And then some, cause he might be certified to adult court . . . . And you can be certified adult and get a life sentence on it too." The original officer said: "So let's have it out, man. Let's get it straight now. You're still a juvenile yet. You get you certified an adult, you're not gonna be treated as juvenile; you're gonna be treated as an adult. They sure hold them tight boy . . . ."

When Roger said "I've gotta see 'em [the other two accused juveniles] before I say anything," an interrogating officer replied: "You ain't gonna see nobody except the court if you want to be that way. I'd see you go to adult court uh, you ain't gonna ride Richard's raft if ah." Roger said, "Oh, yeah?" The officer stated: "You know, if Richard squeezed the trigger and you didn' man, I ain't gonna ride his rap."

The interrogating officer continued: "We ain't askin' you to do the squealing, all we want is your version of what took place. Because, uh, when you go to jail, do time, you're gonna be your own time. You're not gonna be Richard's time, you're not gonna do Jerry's time, you're gonna be your own time. It's your life, man. It's shades. It could be seven or eight or ten or life, you know, sentence out of your life; not their's. You're the guy—number one—you'd better start thinking about and

talkin' about. We don't want to hear about what they did; only what you did."

Another officer entered the questioning. He said: "Say you and I went to a liquor store, and I have a gun, and you don't. . . . And we go in there and all intents and purposes of rob the liquor store. OK? . . . I'm just giving you a for instance. . . . OK? You and I go in a liquor store and you're gonna be my lookout. . . . And I'm gonna pull the job? . . . You know I'm gonna pull the job. So, we get in there and get the money and the liquor store guy reaches under the counter, so I blast him. . . . And, tell you and hey, man, let's make it. OK. I killed the guy." Roger answered: "You gonna get the shades, the shades?" The officer replied: "That's right. Exactly what I was going to tell you." Roger said: "Well, I'll get jes' as much time as he do, won't I?"

Another officer responded: "That's exactly right." The previous officer added: "But it's gonna help you out for a chance of probation or getting parole if you are honest about the thing." Roger said, "Oh, yeah?" The officer continued: "Tell your side of it, because if you go in there hard-nosed and just lie and, try to cover up, do you think we'd give you a chance at probation or parole? No way."

Roger asked: "What is parole?" The officer responded: "Well, that's getting out of jail—you know, you might be six months and get out the rest on parole. And do the rest of the time at home. You understand, well, parole's like probation. A parole, you say, well, you see, ah, I get sentenced to, for robbery. They give me a five-to-life sentence. OK? . . . I go to jail and I serve a year or to 18 months. OK, for the next five years, they're gonna put me on parole and let me out, and I'm gonna do my time outside. I'm still really technically in jail, but I'm out a . . . doing everything I do normally, but I've gotta behave myself, cause if I get involved in any more trouble, I go right back and serve that five years out. But—if I go to jail hard-nosed 'n what-have-you, do you think the Parole Board is gonna listen to me? No, man. They're make me do probably the whole damn five years, or more. You know."

Roger answered: "You think I can get parole, I mean, ah, whatcha call it?" The officer responded: "Not promising it. There's a possibility. But if you go in there with, if, if I was sittin' here and shuckin' with you, and he and I pulled a caper, and he's tellin' me the straight poop, then you're surely gonna listen to him and try to help him more than you are me."

Roger then confessed to aiding and abetting the murder while denying that he fired the fatal shots.

■ A confession is deemed involuntary and hence inadmissible if procured by an express or implied promise of benefit beyond that naturally flowing from a truthful statement (*People* v. *Johnson,* 70 Cal.2d 469, 479 [74 Cal.Rptr. 889, 450 P.2d 265]), or by an express or implied threat that the failure to make a statement will result in consequences adverse to the suspect. (*People* v. *Brommel,* 56 Cal.2d 629, 633-634 [15 Cal.Rptr. 909, 364 P.2d 845].) Conversely, a confession is deemed voluntary and hence admissible if obtained in response to exhortation to tell the truth unaccompanied by express or implied promises or threats. (*People* v. *Hill,* 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908], cert. den., 389 U.S. 993 [19 L.Ed.2d 487, 88 S.Ct. 492]; 390 U.S. 911 [19 L.Ed.2d 884, 88 S.Ct. 838].) "The line to be drawn between permissible police conduct and conduct deemed to induce or tend to induce an involuntary statement does not depend upon the bare language of inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police." (*People* v. *Hill, supra,* 66 Cal.2d at p. 549.) ■ It is our duty as a reviewing court "to examine the uncontradicted facts in order to determine independently whether a confession was voluntary." (*People* v. *Trout,* 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].)

■ Here the uncontroverted facts establish that Roger's confession was involuntary as "involuntary" is defined in the controlling Supreme Court cases. It establishes an implied, if not express, threat of harsher punishment if Roger did not confess, and an implied, if not express, promise of the possibility of more lenient treatment if he did.

Faced with Roger's persistent refusal to confess to the crime or to admit he remembered what happened, the interrogating officer pointed out to Roger that he might be incarcerated until he was 25, while another chimed in that Roger might be certified as an adult defendant and receive a life sentence. The first interrogator added his emphasis that "They sure hold them tight boy." When Roger responded to the statement of his exposure to punishment by asking to talk to the two other suspects, the interrogator responded that if he was going to be that way, "I'd see you go to adult court."

Having first shaken the stick, the interrogators produced the carrot, stating after a discussion of the criminal liability of an aider and abettor,

"But it's going to help you out for a chance of probation or getting parole if you are honest about the thing." To emphasize the matter, they said that "no way" would Roger have a chance of probation or parole if "he [went] in there hard-nosed." They extolled the advantages of parole. They held out its possibility while saying they could not promise it. Having held out the possibility, the interrogators told Roger that they would try to help him more if he told them "the straight poop" than if he did not. Only then did Roger confess.

In sum, the uncontradicted facts establish that the interrogating police officers threatened Roger with certification to the adult court if he did not talk and promised him that they would help him to secure parole if he did. The threat and promise go beyond the bounds of police conduct permissible in securing a confession. Compelling authority of our Supreme Court mandates that the confession be held involuntary.

The prosecution argument to the contrary is untenable. It argues "that since [Roger's] confession did not immediately follow the allegedly improper statements regarding probation or parole made to him by the police officers, but was given only after the police officers' explanation of the nature of parole and their statement that they could not promise parole, it is clear that the allegedly improper statements were not the motivating force behind [Roger's] confession." The prosecution extends its argument with the contention that the interrogating officers did no more than explain a "benefit which flows naturally from a truthful and honest course of conduct" to obtain the confession.

The prosecution ignores the record as well as the mandate of *People* v. *Hill, supra,* 66 Cal.2d 536, 549, that the voluntary or involuntary nature of the statement "does not depend upon the bare language of the inducement but rather upon the nature of the benefit to be derived by a defendant if he speaks the truth, as represented by the police."

While the interrogating officers used bare language informing Roger that they could not promise probation or parole, they made it crystal clear to him that he had no hope of anything other than incarceration if he did not confess. Worse, the interrogators sought to convey to the juvenile that as police, they had the power to determine whether he would be tried as an adult and possibly sentenced to state prison for life, and that they would exercise the power if he did not admit his part in the crime.

The dissent would affirm the adjudication by reason of statistics showing an alarming nation-wide increase in violent crime. There is absolutely no hard evidence that abandonment of the constitutional prohibition upon the use of coerced confessions will reduce the impact of violent crime more than ritual offering will prevent the eruption of a volcano. The Constitution must not be sacrificed to appease the evil spirit. We are judges, not shamans.

We thus conclude that uncontradicted evidence in the record establishes that Roger's confession was involuntary. That conclusion compels reversal of the adjudication of the juvenile court, irrespective of the weight of other evidence of guilt. (*Payne* v. *Arkansas,* 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *People* v. *Matteson,* 61 Cal.2d 466, 470 [39 Cal.Rptr. 1, 393 P.2d 161].)

The judgment (order) is reversed.

Lillie, Acting P. J., concurred.

**HANSON, J.**—I dissent.

This case emanates from the brutal and senseless slaying of one Grace Capistrano shortly before midnight in the vicinity of a community hospital as she, wearing a white nurse's uniform, sat behind the steering wheel of her car, windows up, doors locked and motor running. She was shot in the back through the car window. The bullet lodged in her heart. She was pronounced dead at the scene of the crime.

The defendant, a minor, charged with the crime and represented by a deputy public defender, was tried by a juvenile court judge. As a result of an intensive investigation by the police, their attention was directed toward the defendant as possibly being involved in the killing. The police interviewed the defendant which resulted in a confession (more properly, an admission) which was tape recorded. The tape recording was admitted into evidence over the objection of defense counsel on the ground that it was involuntary. The defendant did not testify in his own defense. At the conclusion of the trial the defendant was found guilty of murder as an aider and abettor, adjudged a ward of the court and committed to the California Youth Authority.

On appeal, defendant contends that his confession (admission) was improperly admitted into evidence because it was involuntarily made

under pressure from impermissible police tactics and that the evidence is insufficient without his confession (admission) to support his conviction of the murder.

While it is the duty of a reviewing court, as noted in the majority opinion, to make an independent examination of the record for uncontradicted facts showing involuntariness, "[a] well settled principle of appellate review dictates that all intendments be indulged to support the trial court findings and that the reviewing court consider the evidence in a light most favorable to the respondent. (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049].)" (*People* v. *Culver*, 10 Cal.3d 542, 547 [111 Cal.Rptr. 183, 516 P.2d 887].)

The quotations from the transcription of the tape recording set forth in the majority opinion are extracted from a transcript consisting of 51 pages of 26 lines each. The trial judge listened to the entire tape in context, considered the arguments of counsel and found as a "matter of law" it was voluntary and therefore admissible and passed on its credibility and reliability as "the trier of fact" on the guilt or innocence issue. The trial judge in response to defense counsel's objection to the introduction of the tape, indicated he was of the opinion that, in context, the interviewing officers promised nothing; their comments were by way of explanation and extolled the virtue of telling the truth. The trial judge also said: "This is the kind of thing we run into in juvenile court constantly wherein the Courts turn around and say 'You didn't tell the kid enough. You didn't warn him; you know that he could go up as an adult. You didn't warn him that he could do so much time in the Youth Authority. You didn't lay the law out to him.' In essence, they did it in a more positive manner. I think what they did was they told him everything that was open and what could happen to him; and kicked in there that it may not be that harsh 'if you tell us the truth.' "

A confession is voluntary when it is the product of a rational intellect and a free will. (*Blackburn* v. *Alabama* (1960) 361 U.S. 199, 208 [4 L.Ed.2d 242, 249, 80 S.Ct. 274].) The officers at the outset warned defendant of his rights in clear and explicit language in all respects in accord with the requirements of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758].[1] There was no

---

[1] "Suspect of D.R. No. 73-3654.

"Roger. This is Detective Varey, Inglewood Police Department; Detective Long, Inglewood Police Department. What we are going to do now is advise you of your rights.

"rubber hose," wrack or screw employed resulting in physical intimidation during the interview. I cannot say, in light of my review of the entire transcript of the tape in context, the whole record on appeal and all of the circumstances, that the trial court erred in admitting the confession into evidence or that the "rational intellect" and "free will" of the defendant was overborne by the interrogation technique of the officers.

---

going to read you your rights, and after each right, I would like you to answer 'yes' or 'no,' you do understand it or you do not understand it. OK?

"A    Yeah.

"Q    Number 1. You have the right to remain silent. Do you understand that?
"A    Yup.

"Q    Yes?
"A    You [sic].

"Q    Number 2. Anything you say can and will be used against you in a court of law. Do you understand that?
"A    Yeah.

"Q    Number 3. You have a right to talk to the lawyer before we talk to you and have him present while we talk to you. Do you understand that?
"A    Yup.

"Q    Number 4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning free of charge. Do you understand that?
"A    You [sic].

"Q    Do you understand each of the rights explained to you?
"A    Yup.

"Q    Do you want to talk about this case or not?
"A    Yeah. I don't even know what I'm arrested for.

"Q    We'll tell you. Do you want a lawyer or not?
"A  . Naw.

"Q    Do you?
"A    Huh.

"Q    OK. That means no?
"A    Uhhuh.

"Q    Now, can you say yes or no?
"A    No.

"Q    Thank you. Move a little closer. OK, Roger, you have been arrested for suspicion of homicide.
"A    That's murder, huh."

I am of the opinion that the defendant was fairly tried and justly convicted.[2]

I would affirm the judgment.[3]

[2]The defendant related to the officers during the interview in question that he did not fire the fatal shot but went with two other juveniles to the vicinity of the hospital where the victim was killed; that he knew there was a gun in the trunk of their car; that at the scene he heard one of the others, whom he identified, say: "Come on, man, let's get her"; that the same person then said, "open the door" and thereafter shot twice through the window of the car; that the juvenile who fired the fatal shot gave the gun to the defendant to get rid of and he (the defendant) gave it to his "stepfather" and a ballistics expert testified that one of the two bullets fired could have been fired from the gun produced by the defendant.

Thus this defendant's intimate knowledge of the circumstances surrounding this murder, including the location of the murder, the description of the victim and car, the two shots fired through the window, and his instructions to police as to the whereabouts of the weapon, all clothe his statement with a badge of reliability. Although the defendant denied firing the fatal shot and tried to exonerate himself, the evidence, direct and indirect, amply supports the lower court's finding of his guilt as an aider and abettor of a heinous murder.

[3]The U.S. News & World Report issue of November 24, 1975, based on the Federal Bureau of Investigation's official Uniform Crime Reports for 1974 (published Nov. 17), states that serious crime rose by a record 17.6 percent in the United States last year. The official increase was the biggest one-year jump since the FBI began keeping records in 1930. The total of serious crimes reported in 1974 was 10,192,020—up 1,525,800 from 1973. Crimes of violence went up 47 percent between 1969 and 1974; there were 14,680 murders in 1969 and 20,600 murders in 1974—up 40 percent. The crime is the heaviest in the western states and specially in metropolitan areas. Crime is climbing again this year—up 13 percent in the first half of 1975. Youths under 18 accounted for 27 percent of all 1974 arrests.