[Civ. No. 46757. First Dist., Div. Two. July 8, 1980.]

In re ANTHONY J., a Person Coming Under the Juvenile Court Law.
JOSEPH J. BOTKA, as Chief Probation Officer, etc.,
Plaintiff and Respondent, v.
ANTHONY J., Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Philip M. Brooks, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, William D. Stein and Linda Ludlow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TAYLOR, P. J.—Defendant, Anthony J., a 15-year-old minor, appeals from a judgment[1] after our remand on the prior appeal[2] (*In re Anthony J.* (1978) 86 Cal.App.3d 164 [150 Cal.Rptr. 183]), contending that: 1) the confession was made in response to improper police inducement after he was advised that the juvenile court would be told he had been cooperative; 2) his state of mind precluded any intelligent waiver of his *Miranda* rights; and 3) the deliberate omission of the police to inform his parents that he was also suspected of two murders and several robberies rendered his confession involuntary under *People* v. *Lara* (1967) 67 Cal.2d 365 [62 Cal.Rptr. 586, 432 P.2d 202]. For the reasons set forth below, we have concluded that the judgment must be affirmed.

Our prior remand was based on *People* v. *Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], which was decided during the pendency of the prior appeal and expressly made retroactive. We concluded that the record then before us was too ambiguous to permit us to make a determination as to the voluntariness or involuntariness of the minor's confession under the reasonable doubt standard mandated by Jimenez. We remanded for a new hearing, instructed the juvenile court

---

[1]Although entitled "Finding on Remand," the order that is the subject of this appeal is tantamount to a judgment, and we have construed it as a judgment of commitment after remand.

[2]The record of the prior appeal has been incorporated by reference in the instant appeal. The prior appeal was from orders of the juvenile court declaring defendant a ward of the juvenile court pursuant to Welfare and Institutions Code section 602, and committing him to the Youth Authority as the result of two counts of first degree murder (Pen. Code, § 187), nine counts of first degree robbery (seven in violation of Pen. Code, §§ 211, 664/211), one count of second degree robbery (Pen. Code, § 211), and one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)).

to admit additional evidence, and to redetermine the preliminary issue of voluntariness under the *Jimenez* standard. The juvenile court did so, and found that beyond a reasonable doubt the minor's confessions were voluntarily made, after a knowledgeable and voluntary waiver of his *Miranda* rights and free of coercion of any kind.

As the minor's contentions require us to make an independent determination based on the totality of the circumstances, the facts set forth in our prior opinion, at pages 167-169 (86 Cal.App.3d), are repeated here.

On January 3, 1977, Keven Troy Austin, a minor, was shot in the arm. On January 5, Austin told Officers Daley and Cisneros that defendant had shot him. The two officers contacted Mr. Ellis, defendant's stepfather, and told him that they were investigating a shooting and his stepson was a suspect. Mr. Ellis informed the officers that he had the gun and produced a .38 caliber weapon. At 1:40 p.m., Richard Grzybowski, the San Francisco Police Department ballistics expert, was asked to test the weapon and compare its bullets with three bullets used in the murders of Mr. Golden and Mr. Smith in November 1976, and the shooting of Austin.

On January 4, defendant had run away with his girlfriend, Yolanda Walker. They spent the night in an abandoned house near defendant's home. Yolanda told him that she was pregnant. On January 5, defendant and Yolanda returned to Yolanda's house; her father, who had a gun, threatened to have defendant killed; her mother called the police, who arrived around 2:40 p.m.

Defendant was arrested and taken to the juvenile bureau at the Hall of Justice where, at 3 p.m., he was advised of his *Miranda* rights and was interviewed for 30 minutes by Officers Cisneros and Daley about the assault with a deadly weapon on Austin. Defendant indicated that he understood his rights and agreed to speak to the officers. Defendant denied any involvement in the Austin matter. After the interview, *defendant was allowed to speak to his parents who were informed that he was a suspect in the Austin incident.* Defendant was then placed in a holding cell, a 10- by 14-foot room with a window in the door and a concrete bench. Defendant had slept only an hour the preceding night; he promptly went to sleep. About 5 p.m., the police were informed that the

criminologist had achieved a tentative match[3] of the bullets used in the Golden and Smith murders and bullets fired from the gun belonging to defendant's stepfather.

Accordingly, about 6 p.m., defendant was awakened and taken to the homicide detail and turned over to Officers Cleary and Falzon. These officers, along with three others, took defendant into an interrogation room, advised him of his rights, and informed him that he was a suspect in two homicides and several robberies.[4] Defendant indicated that he understood his rights and was willing to talk. Officer Cleary and the others left the room to get a tape recorder.

At the suppression hearing, defendant testified that while he was left alone in the room with Falzon, Falzon stated that he would be caught and would be put in jail until he was 80 and reiterated "You help me and I help you." Defendant agreed to confess and Falzon read four or five police reports to him before Cleary returned. Falzon indicated that he would try to make it easier on defendant and tell the court he had been 100 percent cooperative.

Falzon was not called to refute defendant's testimony. Cleary, however, testified that he was gone from the room only a few minutes or seconds and in any event not long enough for Falzon to converse as de-

---

[3]The expert made a positive match on January 6, after he had been informed about defendant's confession.

[4]Each of these occurred in San Francisco as follows: Around midnight on September 26, 1976, Mr. Dougherty and Ms. Cochran were about to enter their car parked on Greenwich Street when two black youths came up behind them with guns and held them up, took Cochran's purse, and fired as they left. About 7:15 p.m. on November 12, 1976, Mr. and Mrs. Toupin were walking near the Palace of Fine Arts when two black youths ran up behind them and demanded money and jewelry at gunpoint; they took some money and a watch.

Around midnight on November 12, 1976, DelValle, May and Conner were near Walnut and Washington Streets when two black youths came out from behind a retaining wall and robbed them at gunpoint of rings, watches and money. About 10 p.m. on November 17, 1976, Ms. McKay was walking near Jackson and Walnut Streets when three black youths in a blue American car drove up and two of the youths jumped out and snatched her purse.

About 8:20 p.m. on November 19, 1976, Donald Smith was shot at 14th and Taraval Streets and subsequently died of the gunshot wound. Around 10 p.m. on November 20, 1976, Mr. and Mrs. Golden were walking their poodle near Clay and Maple Streets. Two black youths approached them and demanded money. Mr. Golden hesitated and one of the boys said "Hand it over or I'll shoot you." Mr. Golden replied "Go ahead and shoot me." The youth shot him twice. Both youths fled. Mr. Golden died from the gunshot wound.

None of the surviving victims were able to make a positive identification of defendant as one of the assailants.

fendant testified and to read through several police reports. Cleary emphasized that neither threats nor promises were made and that defendant was "most cooperative."

The other major witness at the suppression hearing was Dr. Hubert Levenson, a defense psychiatrist, who examined defendant on January 7 and 8, and testified that defendant was functioning as an 11-year-old, thinking in concrete, not abstract, terms; and, that as a result of the separation of his parents and his girlfriend's pregnancy, defendant had lost all of his support systems and was susceptible to suggestion. Dr. Levenson opined that defendant was not capable of making a mature, rational judgment concerning his rights on January 5, the day of his arrest and confession. With the apparent acquiescence of defendant's counsel, the court did not listen to the tapes prior to ruling on their admissibility.

During the juvenile proceedings, defendant denied any involvement in any of the murders or robberies, but admitted the accidental shooting of Austin on January 3, 1977. Defendant also presented alibi evidence as to the murders.

The tapes, which were played at the hearing, indicated that defendant was again given his *Miranda* warnings and indicated that he understood them and wanted to talk. He then confessed to the murder and robbery of Donald Smith on November 19, 1976, to the murder and attempted robbery of Edwin Golden on November 20, 1976, to the attempted robbery of Jerome Dougherty and Patrice Cochran on September 26, 1976, to the robbery of Joseph DelValle, Richard D. May and Truman Conner around midnight on November 12, 1976, to the robbery of Arthur and Lillian Toupin around 7:15 p.m. November 12, 1976, and to the robbery of Colleen McKay on November 17, 1976. Defendant could not recall all of the details of each of the above incidents, such as which victims were alone or accompanied by others. Cleary and Falzon refreshed defendant's memory with leading questions and defendant corrected the details that he had previously described inaccurately. However, defendant admitted being present at each of the incidents with one or the other of his friends and his participation. He also indicated that he might have been involved in other incidents, as he had been "pulling street robberies" since he was 13 years old.[5]

---

[5]At the conclusion of the 3 1/2 hour interrogation, which included 45-50 minutes taped, defendant was taken home to his stepfather, who was then informed for the first

Our prior opinion specifically indicated, at page 172, that Falzon should be called and that more expert testimony concerning the minor's mental and physical condition was indicated.

At the supplemental hearing, Falzon testified that he took custody of the minor about 7 p.m. on January 5 at the homicide detail. After the reading of a standard *Miranda* admonition card, defendant stated he understood his rights and was willing to talk to the police. Cleary informed the minor about the ballistics evidence connecting him to the two murders and asked whether or not he wished to give a statement and to tell the truth. Defendant said he did. Cleary then went to get a tape recorder, leaving Falzon and defendant alone in the interrogation room.

Falzon said: "You tell us the truth, and we'll listen." Falzon could see tears begin to form in defendant's eyes. Falzon said: "You do want to tell us the truth, don't you?" and defendant answered: "Yes." Then Cleary returned with the tape recorder and Falzon told Cleary, "Jack, he just admitted he did it and wishes to lay it all out—isn't that correct, Mr. J.?" Again, defendant replied, "Yes, I do." Thereafter, the tape player was turned on, defendant was admonished again, and he made the confession summarized above.

While Cleary was absent from the room, defendant asked Falzon "what he would get" if he were cooperative. Falzon replied "All we could do is tell the court that you were cooperative." Falzon knew that defendant had no previous experience dealing with law enforcement authorities. After defendant indicated that he would cooperate, Falzon told him they would tape his statement so police could play it for the court "to show how cooperative the minor had been." Falzon denied making any threats whatsoever and indicated that after defendant was readvised of his rights, defendant said he understood and waived them.

Defendant's psychiatrist, Dr. Levenson, was recalled and testified that defendant was unable to deal with abstract concepts, such as the *Miranda* admonitions and the implications of a waiver of constitutional rights. Levenson indicated that defendant had a borderline normal IQ, was not able to think abstractly and functioned at the level of an 11-12-year old. Specifically, defendant could not simultaneously handle

---

time that defendant was a suspect in, and had confessed to, the charged homicides and robberies.

several variables, such as the *Miranda* warnings, and would answer just part of it, rather than the whole.

Dr. Levenson opined that defendant's "confusion" in fact indicated defendant's desire to end the interrogation. Dr. Levenson also indicated that defendant generally was emotionally immature, suggestible and frightened of authority figures. Thus, when confronted with his situation, defendant would tend to tell the truth, but also was capable of deception. Defendant often gave him answers to please rather than direct answers. As to the confession, Dr. Levenson felt that defendant wanted to get out of the pressure situation. He concluded that defendant's understanding of the *Miranda* admonition and its implications was limited to the hope that if he confessed, the officers would stop bothering him. Dr. Levenson admitted that he had never heard the taped interview in its entirety.

To rebut Dr. Levenson, the People called Adeline Nuszbaum, a clinical psychologist for the Department of Mental Health, who had worked at the Youth Guidance Center for 30 years and had interviewed over 5,000 juveniles charged with various criminal offenses. Like Dr. Levenson, she had reviewed the tests made by other psychologists and had read their reports. In addition, she listened to the taped confession in its entirety.

Ms. Nuszbaum interviewed defendant about a month after the day he gave the contested statements to police; at that time, he achieved a *normal score* for a 16-year-old on an adult intelligence test. She believed that defendant had a dull normal-borderline defective IQ and functioned at the level of a 12-year-old. However, she opined that he was capable of understanding the abstractions involved in the *Miranda* warnings as these involve very low-level abstractions which "even a grammar-school child" should be able to understand. She did not believe that defendant was a suggestible individual as that was inconsistent with his suspicious personality. She detected no signs of stress on the tape.

We summarized the applicable rules in our prior opinion (86 Cal.App.3d), at page 170, as follows: "Both the United States Supreme Court and the California Supreme Court have held that the use in a juvenile proceeding of a confession obtained without an intelligent, knowledgeable and voluntary waiver of constitutional rights violates the

Fifth Amendment and the due process clause of the Fourteenth Amendment of the United States Constitution (*In re Gault*, 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]; *Malloy* v. *Hogan*, 378 U.S. 1 [12 L.Ed.2d 653, 84 S.Ct. 1489]; *Payne* v. *Arkansas*, 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *People* v. *McClary*, 20 Cal.3d 218 [142 Cal.Rptr. 163, 571 P.2d 620]; *People* v. *Haydel*, 12 Cal.3d 190, 197 [115 Cal.Rptr. 394, 524 P.2d 866]). Admission of such a confession requires reversal (*People* v. *Spencer*, 66 Cal.2d 158, 163 [57 Cal.Rptr. 163, 424 P.2d 715]; *People* v. *Matteson*, 61 Cal.2d 466, 469 [39 Cal.Rptr. 1, 393 P.2d 161]; *People* v. *Ditson*, 57 Cal.2d 415, 439 [20 Cal.Rptr. 165, 369 P.2d 714]). A reading of the *Miranda* rights is not enough to satisfy the requirements of due process. To be admissible, the confession must be a product of a rational intellect and a free will (*Townsend* v. *Sain*, 372 U.S. 293, 307 [9 L.Ed.2d 770, 782, 83 S.Ct. 745]; *In re Walker*, 10 Cal.3d 764, 776 [112 Cal.Rptr. 177, 518 P.2d 1129]; *People* v. *Berve*, 51 Cal.2d 286, 291 [332 P.2d 97]). The appellate court must make an independent determination, based on the undisputed facts and the totality of the circumstances, as to whether the confession was a product of a rational intellect and a free will (*Stroble* v. *California*, 343 U.S. 181, 190 [96 L.Ed. 872, 880-881, 72 S.Ct. 599]; *People* v. *Sanchez*, 70 Cal.2d 562, 572 [75 Cal.Rptr. 642, 451 P.2d 74]; *In re Linda D.*, 3 Cal.App.3d 567, 573 [83 Cal.Rptr. 544]). There is no presumption of a waiver of one's constitutional rights. The waiver must affirmatively appear on the record (*In re Steven C.*, 9 Cal.App.3d 255, 267 [88 Cal.Rptr. 97])."

██ The burden is upon the prosecution to establish that an accused's statements are voluntary; the burden is greater in the case of a juvenile than the case of an adult (*In re Gault, supra*, 387 U.S., at p. 55 [18 L.Ed.2d, at p. 561]; *Gallegos* v. *Colorado* (1962) 370 U.S. 49, 54 [8 L.Ed.2d 325, 328-329, 82 S.Ct. 1209, 87 A.L.R.2d 614]). The totality of circumstances approach is adequate even where interrogation of a juvenile is involved (*Fare* v. *Michael C.* (1979) 442 U.S. 707, [61 L.Ed.2d 197, 212, 99 S.Ct. 2560]).

██ Minority itself does not invalidate a minor's confession obtained after a recitation of *Miranda* rights and waiver by the minor of his privilege against self-incrimination and the right to consult with counsel (*People* v. *Lara, supra*, 67 Cal.2d, at p. 383). The age of a minor and

his subnormal intelligence are, however, factors to be weighed in determining the voluntariness of his confession (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218, 226 [36 L.Ed.2d 854, 862, 93 S.Ct. 2041]; *Gallegos* v. *Colorado, supra,* 370 U.S., at p. 54 [8 L.Ed.2d, at pp. 328-329]; *Lara, supra,* 67 Cal.2d at p. 385). So is the psychological impact of the questioning (*Schneckloth, supra,* at p. 226; *Gallegos, supra,* 370 U.S. at p. 54 [8 L.Ed.2d at pp. 328-329]; *Lara, supra,* 67 Cal.2d at pp. 385-386).

Whether a minor has waived his rights intelligently and knowingly is a question of contextual fact (*People* v. *Lara, supra,* p. 379; *In re Steven C.* (1970) 9 Cal.App.3d 255 [88 Cal.Rptr. 97]). In *Lara,* 67 Cal.2d at page 376, the Supreme Court observed that race, age, experience with the police, education, mental and physical condition at the time of questioning, and level of intelligence were all factors to be considered in assessing waiver (see *Blackburn* v. *Alabama* (1960) 361 U.S. 199, 205 [4 L.Ed.2d 242, 247, 80 S.Ct. 274]; *People* v. *Sanchez* (1967) 65 Cal.2d 814, 825-826 [56 Cal.Rptr. 648, 423 P.2d 800]). In making the assessment, all relevant circumstances in the entire record must be reviewed[6] (*People* v. *Lara, supra,* 67 Cal.2d at p. 376; *In re Johnson* (1965) 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420]; *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *In re Steven C., supra,* 9 Cal.App.3d at p. 268).

■ Procedurally, the determination of the issue is primarily a question for the trial court and its determination will not be disturbed unless, in light of applicable principles, it is palpably erroneous (*In re Steven C., supra,* 9 Cal.App.3d 255; see also *In re Eric, J.* (1979) 25 Cal.3d 522, 527 [159 Cal.Rptr. 317, 601 P.2d 549]; *In re Norman H.* (1976) 64 Cal.App.3d 997, 1001 [136 Cal.Rptr. 145]; *In re Garth D.* (1976) 55 Cal.App.3d 986, 994-995 [127 Cal.Rptr. 881]). With respect to conflicting testimony, of course, we accept that version of events which is most favorable to the People to the extent that it is supported by the record (accord *People* v. *Duck Wong* (1976) 18 Cal.3d 178, 187 [133 Cal.Rptr. 511, 555 P.2d 297]; *People* v. *Carr* (1972) 8 Cal.3d 287, 296 [104 Cal.Rptr. 705, 502 P.2d 513]).

■ Defendant's contention that his confession was made in response to improper police inducement is negated by the present record. Fal-

---

[6]We have, of course, again reviewed the record and listened to the tape of the interrogation.

zon's response that the juvenile court would be told that defendant had been cooperative was a truthful response to defendant's question. "Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made." (*People v. Jimenez, supra*, 21 Cal.3d, pp. 611-612.)

"Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. As noted by Friedman, J., good faith confrontation is an interrogation technique possessing no apparent constitutional vice. (*People v. Lantz* (1968) 265 Cal.App.2d 5, 8 . . . .) Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. It is apparent that when the police interview a suspect, they must skate a fine line. They are employed to protect the public, to solve crimes, to discover missing persons, and to determine whether missing persons have been the victims of foul play. They are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise" (*People v. Andersen* (1980) 101 Cal.App.3d 563, 576 [161 Cal.Rptr. 707]).

Here, there were no promises of lenient treatment (cf. *In re Roger G.* (1975) 53 Cal.App.3d 198 [125 Cal.Rptr. 625]) nor an unduly long interrogation (cf. *People v. Alfieri* (1979) 95 Cal.App.3d 533, 545 [157 Cal.Rptr. 304]). ■ As to defendant's competency, the testimony of the People's expert contradicted the defense expert. She indicated that defendant was able to understand and waive his rights and was not a "suggestible" individual. As to defendant's first two contentions, we are required to abide by the decision of the juvenile court below which had the distinct advantage of being personally present to hear the testimony and study the demeanor of all the witnesses at all of the proceedings.

■ Defendant's contention predicated on *People v. Lara, supra*, 67 Cal.2d 365, is equally without merit. Defendant asserts that his waiver was not knowing and voluntary since his parents had not been advised

that he was also a suspect in the murders and robberies. In *Lara*, our Supreme Court stated at page 379 that in police interrogation of juveniles, the advice and consent of an adult is "to be *desired*, and *should be* obtained whenever feasible," but held, at page 383, that as a general rule,[7] "*a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult*, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement" (italics added).

Here, defendant did not ask to see or speak to his parents and gave no indication that he wanted the interrogation to cease (cf. *People v. Burton* (1971) 6 Cal.3d 375, 382 [99 Cal.Rptr. 1, 491 P.2d 793]; *People v. Level*\* (Cal.App.); *People v. Alfieri, supra*, 95 Cal.App.3d, at p. 543). His parents, who knew of his detention on the assault charge, also made no request to see him (cf. *In re Patrick W., supra*, 104 Cal.App.3d 615).

Here, there was no violation of statute[8] nor an express request by the minor or his parents. Defendant had already been given the opportunity to talk with his parents, knew that they were available and thus, was aware that he could request to see them. Here, the failure of the authorities to seek the consent of defendant's parents cannot be held to outweigh an evidentially supported finding that a proper waiver was made (*People v. McFarland* (1971) 17 Cal.App.3d 807 [95 Cal.Rptr. 369]). We conclude that the record now fully supports the trial court's

---

[7]We are, of course, aware of the view that a minor is not competent to waive his rights *without the consent of an adult*, urged by the dissent in *Lara, supra*, 67 Cal.2d at page 395, and more recently the concurring opinion in *In re Patrick W.* (1980) 104 Cal.App.3d 615, 619 [163 Cal.Rptr. 848]).

\*Reporter's Note: Deleted on direction of Supreme Court by order dated June 25, 1981.

[8]We also note that notice of constitutional rights, including the right to counsel, is statutorily required to be given to the minor *and* his parents or guardian during at least one of three stages: when the minor is initially brought before the probation officer (Welf. & Inst. Code, § 627.5); at the detention hearing (Welf. & Inst. Code, § 634); and at the reading of the petition at the hearing (Welf. & Inst. Code, § 700). Counsel is to be appointed if either the minor *or* his parent or guardian so requests. The right to counsel cannot, therefore, be waived solely by the child in these particular instances. There must be concurrence in this decision by his parent or guardian, whose consideration is to be actively solicited (see, *Waiver of Constitutional Rights by Minors: A Question of Law or Fact?* (1967) 19 Hastings L.J. 223; Shoben, *The Interrogated Juvenile: Caveat Confessor?* (1973) 24 Hastings L.J. 413).

findings that defendant's confession was made voluntarily after a knowing and intelligent waiver of his rights.

The judgment declaring defendant a ward of the juvenile court is affirmed.

Rouse, J., and Miller, J., concurred.