Filed 12/10/15  P. v. Rosales CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ARMANDO ROSALES,<br><br>    Defendant and Appellant. | B257795<br><br>(Los Angeles County<br>Super. Ct. No. BA420199) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Anne H. Egerton, Judge.  Affirmed.

John P. Dwyer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Armando Rosales seeks review of a judgment which sentences him to state prison for 50 years to life for the murder of Jose Chavez. He contends on appeal that a chief witness' testimony was rendered involuntary by the interrogation tactics of two detectives from the Los Angeles Police Department (LAPD) and that the trial court should have allowed defense counsel to impeach another witness' testimony. We affirm the judgment.

**FACTS**

Jose Chavez was shot seven times on June 27, 2012, while on a stairway linking two streets in Echo Park. Rosales was arrested on June 29, 2012, and charged with Chavez's murder (Pen. Code, § 187, subd. (a)).[1] The information also alleged firearm and criminal street gang enhancements (§§ 12022.53, subds. (b)-(d) & 186.22, subd. (b)(1)(C)).

A jury trial began on April 22, 2014. The prosecution presented evidence that Rosales shot Chavez because Chavez stole his black Nike shoes. When Rosales confronted him, Chavez returned the shoes. However, Rosales remained angry at Chavez and Rosales was incited to shoot him by 14-year-old Elvis Mejia. Statements to the police by witnesses shortly after the shooting supported the prosecution's theory of the case. However, these witnesses, including Rosales' friend, Eric Patterson, and Rosales' fiancée, Maria Gamez, recanted their statements at trial, explaining they were coerced by the police during the interviews into implicating Rosales.

Patterson testified he heard gunshots, but otherwise did not know anything about the shooting. However, Patterson previously told the LAPD detectives in an interview that Rosales shot Chavez over the stolen shoes. At trial, Patterson admitted making those statements, but explained he only did so because he felt threatened by the detectives. When Rosales was arrested, he was a passenger in Gamez's car, which contained a pair of black Nike shoes belonging to Rosales. Gamez and Rosales had dated briefly during high school and kept in touch. Gamez told the police Rosales admitted he shot someone

---

**1** All further section references are to the Penal Code unless otherwise specified.

and he was running away. At trial, Gamez, who was now Rosales' fiancée, recanted her statements to the police. She testified she repeated what the detectives told her to say because they threatened to book her as an accessory to murder. In a videotaped interview two days after the shooting, Mejia told the police Rosales shot Chavez because he stole Rosales' shoes. This videotape was shown to the jury. At trial, Mejia testified he was the shooter, but otherwise refused to answer any questions.

Selene Castellanos, Chavez's ex-girlfriend, testified she saw Rosales and Mejia follow Chavez down the stairway minutes before the shooting. Juan Segovia was in the park across the street with his wife and son when he heard gunshots. He saw a body lying on the stairs. He also saw two young Hispanic men of average build and height with short hair running down the stairs and under a freeway overpass. One of them was carrying a handgun. Segovia did not identify the men. Eight-year-old Rene V. corroborated Segovia's observations. He heard loud sounds "like fireworks" and saw "two guys shooting another guy." He then watched two men running away. Rene observed that one of them had a gun. It was stipulated that Rene identified Patterson at a field show-up as the man without the gun. Rene also identified Rosales in a photographic lineup. However, Rene failed to identify Mejia in a photographic lineup and did not identify Rosales at trial.

Rosales' defense centered on the theory that Castellanos, Rosales' ex-girlfriend, was angry that Rosales was in "her" neighborhood. As a result, she arranged for him to be attacked by Echo Park gang members, but did not expect they would kill him. She told police, "They didn't have to kill him, they were looking for him." Both Patterson and Mejia told the police Chavez was afraid of the Echo Park gang.

The jury returned a verdict finding Rosales guilty of murdering Chavez and further found true the special firearm and street gang allegations. Rosales was sentenced to an aggregate term of 50 years to life for the murder conviction and the firearm enhancement. The gang enhancement was stayed. He timely appealed.

3

# DISCUSSION

Rosales contends two errors require reversal of his conviction. First, the trial court erred when it admitted Patterson's statements to the police into evidence because they were coerced. Second, defense counsel should have been allowed to cast doubt on Castellanos' credibility with her sexual advances toward a detective during trial. We conclude neither supports reversal.

## I.  Patterson's Statements

### A.  Procedural Background

Patterson was placed at the scene of the crime by the eight-year-old eyewitness. Patterson had no criminal history. He was detained on the day of the shooting for possession of brass knuckles, but was brought in for questioning about the shooting. After waiving his *Miranda*[2] rights, Patterson submitted to a recorded interview with the police where he identified Rosales as the shooter.[3] At trial, Patterson recanted his statements to the police and testified he did not see the shooting but only heard a number of gunshots. He denied knowing anything about the shooting. He testified he only implicated Rosales because the police threatened him during the interview.

By way of impeachment and as substantive evidence of guilt, the prosecutor submitted into evidence a transcript of the prior statements made by Patterson to the police. In the video-recorded interview, the detective indicated, "I'm pretty positive you know why we're here[,]" even before Patterson was *Mirandized* or questioned. The detectives then advised Patterson, "I need to let you know that it's going to be the only time you have a chance to basically give your side of the story. I think, you know, you just got screwed, basically at the wrong place at the wrong time." Patterson initially denied knowing anything about the shooting. He had just moved into the area a few months ago. He heard five or six gunshots while walking around the neighborhood.

---

**2**    *Miranda v. Arizona* (1966) 384 U.S. 436.

**3**    At trial, Patterson testified he asked to speak to his father prior to the interview, but that request was refused.

4

When Patterson continued to deny any knowledge of the shooting, the detectives warned him, "right now we're going down the accessory road, accessory to commit this crime, because you continue to lie to us about it." Patterson reluctantly admitted he had been smoking marijuana with two guys, "Mando" and Elvis. They were joined later by a fourth person, Chavez, with whom Mando and Elvis appeared friendly. He continued to deny knowing who shot Chavez. At one point, however, Patterson admitted it was "most likely" one of the "kids" he had been hanging out with that day.

During the interrogation, Patterson acknowledged he was unwilling to identify anyone as the shooter because he feared retaliation. The detectives assured him they would not name him as the one who "talked" to the other suspects. When he continued to deny knowing the shooter, the detectives again threatened him: "You know right now you can be charged with a crime; right?" The detectives indicated witnesses placed Patterson at the scene of the crime and Patterson had a picture of him with Rosales on his phone throwing gang signs for Big Top. They also lied and told him that gunshot residue had been recovered from his hand and arm. As a result, they believed Patterson was "either a witness, a really good witness, or an accomplice to this." They continued to pressure him, telling him, "Somebody had a gun there. You know which one of these guys had the gun. . . . If you want to sit here and keep shit to yourself, tell us. We'll just take you down and book you and photograph you, fingerprint you, and you go to trial."

After these threats, Patterson immediately identified Rosales as the shooter. He explained he had been with Rosales and Mejia when they happened upon Chavez, who complained to them about his girlfriend cheating on him. Chavez also believed she and her brother were trying to get the Echo Park gang to "jump" him. At some point, Chavez asked Rosales to buy blunt wraps at the medical marijuana dispensary for him. Patterson accompanied Rosales on the errand. On the way, Rosales told Patterson that Chavez stole his shoes from his back porch. When Rosales confronted Chavez, he gave them back. However, Rosales was still angry about it. Patterson knew Rosales had a gun because he had shown it to him earlier in the day.

After smoking marijuana with Rosales, Patterson and Mejia, Chavez left. Rosales and Mejia discussed following him and shooting him. Patterson counseled Rosales to drop the matter, but Mejia encouraged him to do it. Patterson saw Rosales and Mejia standing and talking with Chavez. He also saw Rosales confront Chavez with a gun but did not see him shoot the gun.

## B. Relevant Law and Standard of Review

The " ' "admission at trial of improperly obtained statements [of a third party] which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial." ' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 966.) Thus, "when the defendant seeks to exclude a third party's pretrial statement which was obtained through unlawful police coercion the defendant need only prove the unlawful coercion. If he does so, the evidence is deemed 'inherently unreliable.' " (*People v. Lee* (2002) 95 Cal.App.4th 772, 788 (*Lee*) quoting *People v. Badgett* (1995)10 Cal.4th 330, 347 (*Badgett*).) "The statement of a suspect or witness is coerced if it is the product of police conduct which overcomes the person's free will." (*Lee, supra*, at p. 782, fn. omitted.)

In deciding if a defendant's will was overcome, courts examine " 'all the surrounding circumstances—both the *characteristics of the accused* and the *details of the interrogation*.' " (*In re Shawn D.* (1993) 20 Cal.App.4th 200, 208.) Thus, the person's "age, sophistication, prior experience with the criminal justice system and emotional state" are considered as well as whether officers deceived the witness, made promises of leniency, employed psychological manipulation, or threatened to take official action against the witness or someone close to him. (*Id.* at p. 210; *Lee, supra*, at p. 782; *Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)

On the other hand, "California courts have long recognized it is sometimes necessary to use deception to get at the truth. Thus, the courts have held, a 'deception which produces a confession does not preclude admissibility of the confession *unless the deception is of such a nature to produce an untrue statement*.' It is also well established exhortations directed to the suspect or witness to 'tell the truth' are not objectionable." (*Lee, supra*, 95 Cal.App.4th at p. 785, fns. omitted.) Deception may be considered in

6

deciding whether the totality of the circumstances indicate that the confession was involuntary. (*People v. Hogan* (1982) 31 Cal.3d 815, 840-841 disapproved on different grounds by *People v. Cooper* (1991) 53 Cal.3d 771, 836; *People v. Engert* (1987) 193 Cal.App.3d 1524.) " '[M]ere questions, or exhortations to tell the truth or clear [one's] conscience or help [one]self by revealing facts as to the dominant part of [a codefendant] or some other person in the criminal enterprise' " are insufficient: " '[I]ntellectual persuasion is not the equivalent of coercion.' [Citation.]" (*People v. Hill* (1967) 66 Cal.2d 536, 548-549.)

As the facts regarding the interrogation are not in dispute, we independently review the entire record to determine whether a witness' statement was coerced, so as to render the defendant's trial unfair. (*Lee, supra*, 95 Cal.App.4th at p. 781; *Badgett, supra*, 10 Cal.4th at pp. 350-351.)

### C. Analysis

Here, Patterson was questioned about the shooting because a witness identified him as one the men fleeing the scene of the crime. Rosales complains that the officers coerced Patterson into identifying him as the shooter by lying about the results of the gunshot residue test and by threatening Patterson with arrest for being an accessory to the crime. Further, Rosales contends Patterson's fear of criminal prosecution, his youth, and his lack of experience with the criminal justice system supports a finding that his statements were involuntary.

In *Lee, supra*, 95 Cal.App.4th at pp. 783-785, the court faced a similar issue— whether to exclude a witness' prior statement to the police which implicated the defendant. There, the sole witness to a murder was interrogated by a polygraph examiner, who initially extolled the accuracy of the polygraph technology to the witness. He then misled the witness to believe the polygraph results indicated there was a 97 percent probability the witness was the shooter. (*Id.* at p. 783.) Finally, he threatened the witness with a first degree murder prosecution unless he identified the defendant as the killer. (*Id.* at pp. 784-785.) The polygraph examiner provided the witness with the name of the defendant and the potential motive. (*Ibid.*)

7

The appellate court held the statements were inherently unreliable, highly prejudicial to defendant, and had to be excluded under the Due Process Clause. The officer went beyond mere deceit in accusing the witness of killing the victim. The interrogation of the witness was not designed to produce the truth as the witness knew it but to produce evidence to support a version of events the police had already decided upon. (*Lee, supra*, at p. 786.) As a result, the trial court erred in admitting the witness' statement to the police. (*Ibid.*) Given the lack of evidence of defendant's guilt, the court found the error was not harmless beyond a reasonable doubt. (*Id.* at pp. 788-789.)

The interrogation in this case differs from the interrogation in *Lee* in an important aspect: The interrogation was not designed to produce evidence to support a version of events the police had already decided upon. Unlike in *Lee*, the officers did not provide Patterson with Rosales' name or a potential motive. Patterson, while initially reluctant to tell the police anything, eventually identified Rosales himself and attributed a motive for the shooting. The police did not urge him to adopt a version of events they had in their minds.

Moreover, the detectives did not deceive Patterson when they read Penal Code section 32 to him and warned him, "right now we're going down the accessory road, accessory to commit this crime, because you continue to lie to us about it." Under section 32, "[e]very person who, after a felony has been committed, harbors, conceals or aids a principal in such felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony or has been charged with such felony or convicted thereof, is an accessory to such felony." At the time of the interview, a witness had identified Patterson as one of the men fleeing the scene of the crime. Further, Patterson was discovered with a weapon—brass knuckles. The detectives had reason to believe Patterson was involved in the shooting. Unlike in *Lee*, their factual description of the potential criminal charges Patterson faced falls within the bounds of proper interrogation technique. (See *People v. Boyer* (2006) 38 Cal.4th 412, 445 ["There is nothing

8

improperly coercive about confronting a lesser participant in a crime with his or her predicament, and offering immunity from prosecution for the witness's criminal role in return for the witness's promise to testify fully and fairly."].)

Neither are we persuaded the detectives' deception about the results of the gunshot residue test rendered Patterson's subsequent identification of Rosales as the shooter involuntary. In *People v. Parrison* (1982) 137 Cal.App.3d 529, 537, the police falsely told the defendant a gun residue test had produced a positive result. The court held this did not overbear the defendant's will; "[t]hey made no promises to him nor did they threaten him. They simply informed him, albeit incorrectly, of the test results and waited for his reaction." (*Id.* at p. 537.) Although Patterson testified at trial he feared the threats made by the detectives, he never communicated this fear during the interrogation. Instead, he told the detectives he feared reprisal from Rosales and Mejia. Given the totality of the circumstances surrounding Patterson's statements, we conclude the LAPD's interrogation techniques did not overbear Patterson's will.

We likewise distinguish the cases relied upon by Patterson. In each, the police employed overbearing and false tactics like those used in *Lee* to elicit a confession from the defendant. In *In re Roger G.* (1975) 53 Cal.App.3d 198 (*Roger G.*), for example, the defendant was a 17-year-old minor who possessed a pistol which ballistics testimony concluded had a 50-50 possibility of being the murder weapon. Further, eyewitness testimony was "somewhat equivocal" in identifying him as the shooter. (*Id.* at p. 200.)

The officers told the defendant he could be tried as an adult and receive a life sentence if he refused to confess. They told him he might be incarcerated for " 'seven or eight or ten or life, you know . . .' " and said, " '. . . it's gonna help you out for a chance of probation or getting parole if you are honest about the thing. . . . [but] if you go in there . . . and . . . try to cover up, do you think we'd give you a chance at probation or parole? No way.' " (*Roger G., supra,* at pp. 200-201.) They then told him he had a chance of probation or parole if he confessed. (*Id.* at p. 201.) The appellate court found the confession to be involuntary, reasoning. "While the interrogating officers used bare language informing Roger that they could not promise probation or parole, they made it

9

crystal clear to him that he had no hope of anything other than incarceration if he did not confess. Worse, the interrogators sought to convey to the juvenile that as police, they had the power to determine whether he would be tried as an adult and possibly sentenced to state prison for life, and that they would exercise the power if he did not admit his part in the crime." (*Id.* at p. 203.)

*People v. McClary* (1977) 20 Cal.3d 218 (*McClary*) overruled on another ground by *People v. CaHill* (1993) 5 Cal.4th 478, 510 is also unpersuasive. *McClary* involved a 16-year-old suspect. During an interview, the interrogating officers ignored her repeated requests to talk to a lawyer, and falsely told her that she would face the death penalty unless she changed her statements she had not been involved. The officers also strongly implied that she would be charged only as an accessory after the fact if she admitted mere knowledge of the murder. (*McClary, supra*, 20 Cal.3d at p. 229.) The Supreme Court found the confession was not voluntary. (*Ibid.*) This matter does not involve the same level of deceit and threats detailed in *Roger G.* and *McClary*.

## II.    Castellanos's Conduct

At trial, the jury learned that Castellanos and Chavez lived together for several years and had three children. Castellanos testified she saw Rosales and Mejia follow Chavez down the stairway minutes before the shooting. On the second day of her testimony, a LAPD detective drove Castellanos to an appointment during the lunch recess. That detective was also involved in the case, having participated in the investigation into the shooting. On the way to and from the appointment, Castellanos grabbed the detective's crotch and asked, "are you down?" The detective rebuffed her advances and explained to her that her conduct was inappropriate and could jeopardize the case and his employment. He reported the two incidents to the LAPD and to the court.

Defense counsel sought to ask the detective about the incidents during his testimony. The trial court sustained the prosecution's objection on Evidence Code section 352 grounds for undue consumption of time and the extensive collateral proceedings that would be required. Rosales contends the trial court erred in excluding

10

this evidence. He notes that Castellanos appeared on the stand to be genuinely grieving Chavez; she cried each time his name was mentioned or his photograph shown. He contends that precluding Rosales from admitting evidence that may have shown Castellanos' grief was contrived deprived him of "critical evidence that would have given the jury a reason to believe the defense theory of the case that Castellanos was behind Chavez's death."

Evidence of the incident between the detective and Castellanos was relevant to Castellanos' credibility. A witness' demeanor "bears on the credibility and weight the trier of fact accords the witness's testimony." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358; Evid. Code, § 780.) The trial court, however, has discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*People v. Scott* (2011) 52 Cal.4th 452, 493; Evid. Code, § 352.) We review a trial court's ruling under Evidence Code section 352 for an abuse of discretion. (*People v. Mills* (2010) 48 Cal.4th 158, 195.)

Here, even if the trial court's exclusion of the evidence was error, it was harmless. We determine whether the erroneous exclusion of evidence is harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*People v. Welch* (1999) 20 Cal.4th 701, 749; see also *People v. Cudjo* (1993) 6 Cal.4th 585, 611.) Under the *Watson* standard, Rosales must show a reasonable probability that he would have received a more favorable result absent the error. (*Watson, supra*, at p. 36.)

Evidence of Rosales' guilt was strong. Multiple witnesses placed Rosales at the scene. Patterson and Mejia reported to detectives that Rosales had a gun, had motive, and had the opportunity to shoot Chavez. Each of them independently told detectives the same story—that Rosales shot Chavez because he was angry about the stolen shoes. Both Mejia and Patterson also indicated they feared retaliation for incriminating Rosales and then recanted their statements at trial. Gamez supported their statements by telling

11

the police Rosales admitted to shooting someone mere days after Chavez's death. A pair of black Nike shoes was also found in her car at the time Rosales was arrested.

Segovia and Rene's testimony further corroborated Patterson and Mejia's account of the shooting. They observed two young Hispanic men run down the stairs where the shooting took place. Rene also was "100 percent sure" that Rosales was the man with a gun in a photographic lineup. Although there were inconsistencies as to Rene's identification, such as his identification of Patterson as one of the young men running down the stairs and failure to identify Rosales at trial, those factors were explored at trial.

Moreover, the jury heard testimony Castellanos and Chavez had been broken up for two years prior to the shooting. They did not have a friendly relationship; she did not want him in her neighborhood and went so far as to ask her neighbors to alert her to his presence in Echo Park. Chavez complained that Castellanos and her brother asked Echo Park gang members to "jump" him. In fact, Rosales' defense was centered on the theory that Castellanos inadvertently orchestrated the shooting by sending Echo Park gang members to harass Chavez. This evidence of Castellanos' animosity towards Chavez at the time of the shooting more powerfully impeached her credibility than evidence of her sexual conduct two years after his death. Thus, there was not a reasonable probability that he would have received a more favorable outcome absent the error.

Rosales contends we must base our harmless error analysis on the federal standard articulated in *Chapman v. California* (1967) 386 U.S. 18, because his constitutional rights were violated. Given the facts stated above, it was harmless error to exclude the evidence even under the higher *Chapman* standard.

### III. Cumulative Error

For the reasons discussed above, we find the trial court did not err in admitting Patterson's statements to the police into evidence. Moreover, the exclusion of evidence regarding the incident between Castellanos and the detective was harmless error. Thus, we reject defendant's contention that cumulative error mandates reversal. (*People v. Williams* (2013) 56 Cal.4th 165, 201.)

12

**DISPOSITION**

The judgment is affirmed.

BIGELOW, P.J.

We concur:

RUBIN, J.

FLIER, J.

13