**Charles Walter HILL, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 1032–83.**

Court of Criminal Appeals of Texas, En Banc.

July 3, 1985.

---

G. Thomas Cannon, Ralph H. Brock, Lubbock, for appellant.

Jim Bob Darnell, Dist. Atty. and Hollis M. Browning, Asst. Dist. Atty., Lubbock, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted by a jury of murder who assessed his punishment at 40 years in the Department of Corrections.

On appeal appellant contended, inter alia, that the trial court erred in failing to suppress E____ Y____'s in-court identification of him because the State did not show her identification came from a source independent of and not tainted by a photographic display and an illegal lineup. Appellant further urged the trial court erred in permitting E____ Y____ to testify, over objection, that she had also identified him in a pre-trial lineup because a causal connection existed between that identification and his illegal arrest which was made for the very purpose of obtaining such identification.

The Amarillo Court of Appeals affirmed the conviction in an unpublished opinion—

*Hill v. State*, (No. 07–81–0207–CR–August 5, 1983). After reviewing the circumstances, the Court of Appeals concluded E____ Y____ had an adequate opportunity to view the appellant at the scene of the alleged murder and that her in-court identification had an origin independent from photographic display and the lineup. With regard to appellant's claim E____ Y____ should not have been allowed to relate her identification of him at a lineup, the Court of Appeals concluded, that even assuming arguendo that the arrest was unlawful and the lineup was the fruit of the illegal arrest, the admission of the challenged testimony was harmless error beyond a reasonable doubt given the circumstances of the case.

We granted appellant's petition for discretionary review to determine the correctness of the decision of the Court of Appeals as to the matters set forth above.

For the purpose of this opinion we adopt the recitation of facts by the Court of Appeals concerning the alleged offense.

"On or about 31 March 1978, Robert Rivera was killed in an incident which occurred in Lubbock County. Robert and the prosecutrix were parked in his car on a dirt road south of an overpass on Loop 289 in southeast Lubbock. While they were sitting in the car, two men came to the scene. One of the men killed Robert and raped the prosecutrix. At the trial of a co-defendant, the prosecutrix identified the co-defendant as Robert's assailant and her rapist. At the appellant's trial, the prosecutrix identified him as the other perpetrating party.

"Among other things, the record before us shows that during that late afternoon and early evening hours of 31 March 1978, the prosecutrix was at home with her sisters. During that period, she drank four or five beers prior to the arrival of the deceased, Robert Rios Rivera, at approximately 10:00 p.m. The deceased asked the prosecutrix to go with him to the liquor store. After a short conversation, the proxecutrix changed her clothes and accompanied the deceased to 'Jordan's' on 4th Street, on the east side of Lubbock. At Jordan's, the deceased purchased two six packs of beer, and then headed the car back towards the city, again on 4th Street. The prosecutrix testified that she drank one of the beers from the two six packs but that she was not intoxicated.

"After stopping on a dirt road for the deceased to 'use the restroom,' the couple drove to a convenience store at Quirt and Broadway, in order to purchase some cigarettes. They then drove out East 19th away from town and just outside of Loop 289. The deceased parked the car on a dirt road amidst 'a bunch of trees' but in sight of Loop 289. The prosecutrix and the deceased then engaged in sexual intercourse. After intercourse, the deceased got out of the car to use the restroom and the prosecutrix dressed. The deceased then asked her to get into the back seat with him, and began to do so himself.

"The prosecutrix testified that, at that moment, someone shouted from behind the car, 'You Mexican, get out.' The deceased had been about to enter the driver's side of the back seat. The prosecutrix further testifed that the deceased responded, '[y]ou b_____ m_____ f_____,' or something to that effect. She could not yet see anyone outside the car but observed that the deceased had been shot 'in the mouth.'

"A man, whom she later identified as the appellant's co-defendant, then 'told [her] to jump in the back seat,' and to 'pull off [her] drawers.' The prosecutrix complied with each order, after which she witnessed the co-defendant insert a pistol-ladened hand through the lowered portion of the back window, again shooting the deceased in the area of the mouth. The deceased slumped over onto the prosecutrix, who was, by this time, screaming and crying. The co-defendant then ordered her to get out of the car and remove her blouse.

"The prosecutrix crawled over the deceased's body, exited the car on the driv-

er's side and faced the two men (the appellant and co-defendant), standing outside the automobile. She testified that at this point, the two men were right in front of her. She also stated that both men were armed with handguns and both were pointing them '[r]ight in [her] face.' The shorter of the two men (the co-defendant) then told the prosecutrix to walk over to a tree and raped her. During the progress of the rape, the taller man (appellant) was searching the deceased's car.

"After the rape, the co-defendant forced the prosecutrix to walk in front of him to the car. The appellant, at this time, was 'throwing' the deceased out of the car and stripping the clothes from his body. The appellant yelled at the prosecutrix to take off the deceased's watch. She did so and handed the watch to the appellant from a distance estimated to be two or three feet. Appellant took the watch and placed it in his shirt pocket with one hand while holding his gun with the other. The men then returned the prosecutrix's clothes to her along with those of the deceased. She redressed in her clothes but put on the deceased's boots because one of her own shoes had been lost during the events of the evening.

"At this juncture, the appellant began to argue with the co-defendant, urging him to 'get rid of' the prosecutrix. The two men discussed whether or not to kill her for a period of 'minutes,' all the while she was crying and begging them not to hurt her. Resisting the appellant's demands, the co-defendant told the prosecutrix 'that if [she] talked, that they'd look for [her],' and then ordered her 'to start walking.' After just a few steps, however, the co-defendant called her back 'because the other one [appellant] was running up and down telling him [the co-defendant], "you better get rid of her, you can't let her go."' The prosecutrix returned to where the men were and again begged them not to hurt her. Finally, the co-defendant told her 'to start walking again and not look back

until they were gone.' After watching the men take off in the deceased's car, the prosecutrix ran through the field until she came to a farmhouse. She called for help. A man came from the house, assisted her and notified the Sheriff's office."

Prior to trial the court conducted a hearing on appellant's motion to suppress the in-court identification.

E____ Y____ described the two black males who approached her and the deceased at the scene of the killing on March 31, 1978. She identified appellant as one of the men, and told how his companion had shot the deceased and raped her. She stated that appellant was close enough to her on four occasions for her to reach out and touch him. He was standing in front of her. She saw the anger in his face, that the lighting from the Loop 289 highway lights illuminated the area adequately. She was able to identify him because "I remember him from that night."

Some nine months after the alleged offense a composite drawing was completed according to E____ Y____'s description of the man she later identified as appellant.

E____ Y____ acknowledged that officers had shown her a photographic spread but she was unable to make any identification from the photos. On another date she stated she observed a lineup and immediately identified the appellant.

Lubbock County deputy sheriffs Bohannon and Keesee testified as to their investigation of the case. On March 23, 1979, they were at Wigfall's Recreation Center when the appellant approached them, told them he was Charlie Hill, a half brother of Gary Lynn Vester who was in jail on the murder charge, and stated they had the wrong man. They learned he lived at the Vester house nearby and knew that footprints had been followed from the murder scene to within several hundred yards of the Vester house by officers shortly after the alleged offense, that information from Thomas Wigfall had lead them to check files on the Vester family, and that a

search warrant had been executed at the Vester home in June, 1978.

The officers had not heard of Hill before, and they continued to observe him in the Recreation Center. They decided he bore a resemblance to the composite drawing by a police artist. Appellant wore sloppy clothes and his shirt was unbuttoned to the waist just as E——— Y——— had described.

On the same date they took a photographic spread to E——— Y——— including a photo of appellant. The only one they could find at the time had been taken after he had been in a fight. The photo showed his face bruised and swollen.

They testified E——— Y——— pushed appellant's photo aside and she couldn't rule it out, but she made no positive identification.

On March 29, 1979, appellant was arrested on a street corner across from the Lubbock County courthouse and jail. He was shortly thereafter placed in a lineup and identified by E——— Y———. The arrest was warrantless and the lineup was conducted before formal charges were filed. Deputy Keesee had been to the district attorney's office and thought an arrest warrant for a material witness had been issued or was being issued. There was some mention of a possibility of a misdemeanor warrant. However, the record reflects there was no outstanding warrant at the time of appellant's arrest, and no showing that there was any basis for a warrantless arrest under Texas law. Keesee admitted he had no warrant at the time of arrest but stated he felt he had the right, under the circumstances, to detain appellant for the purpose of a lineup.

At the conclusion of the pre-trial hearing the court found E——— Y———'s identification to have been based on her observations at the scene, and independent of and not tainted by the photographic spread or the lineup. As to the objection that any evidence as to the lineup was inadmissible, the court ruled probable cause existed for appellant's detention and appearance at the lineup.

In response to appellant's grounds of error the Court of Appeals in its unpublished opinion wrote:

"In argument under the first ground, the appellant states that on 23 March 1979, the prosecutrix was shown a photographic array which included a picture of the appellant; she was unable to identify the appellant at this time. On 29 March 1979, the prosecutrix viewed a lineup, including the appellant, at which she identified the appellant as the taller of the two men who committed the offense. Appellant complains, however, that because of the closeness in time of the photographic array and the lineup, the prosecutrix's inability to identify him at the photo spread, and the fact that his face was the only one common to both identification sessions, the pre-trial lineup was unnecessarily suggestive. As a result, appellant claims, the suggestiveness of the pre-trial lineup tainted the in-court identification. We disagree.

"Initially, we note that appellant does not claim that either the photo array or the lineup was, of itself, unnecessarily suggestive. Similarly, we have found nothing in the record to indicate that either of the pre-trial procedures, standing alone, was improper. Furthermore, appellant has not cited, nor have we found any authority which holds that the inclusion of a defendant's face as the only one common to both a photo array and a lineup is impermissibly suggestive. Nevertheless, even if we assume arguendo, that the procedures employed in this case were unnecessarily suggestive, the clear and convincing evidence shows that the prosecutrix's in-court identification of the appellant had an origin independent of the lineup in question and was therefore admissible.

"In *Manson v. Brathwaite*, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the United States Supreme Court, in rejecting a *per se* exclusionary rule, concluded that 'reliability is the linchpin in determining the admissibility of identification testimony.' *Id.* at 114 [97 S.Ct. at 2253]. This sentiment was adopted by

the court in *Munguia v. State,* 603 S.W.2d 876 (Tex.Cr.App.1980). Among the factors enumerated in *Munguia* to be considered in making such a determination are: (1) the witness' opportunity to view the defendant during the commission of the offense; (2) the witness' degree of attention; (3) the accuracy of the prior description of the accused; (4) the level of certainty of the identification; and (5) the amount of time between the crime and confrontation. *Id.* at 878.

"The record shows that the prosecutrix was a witness to and a victim of a vicious criminal episode. The events of the criminal episode were sufficiently severe to gain the prosecutrix's attention. The evidence is abundantly clear that the prosecutrix had ample opportunity to observe the appellant during the commission of the offense. While the duration of the offense is not clear from the evidence, the prosecutrix stated that she was able to observe the appellant for 'a long time.' Additionally, she testified that with the light from Loop 289 she 'could see good,' and that 'he [appellant] was standing in front of me [the prosecutrix] several times'; she testified that he was close enough for her to touch.

"Although the prosecutrix was unable to make a positive identification of the appellant in the 23 March 1979 photographic array, each of the officers present testified she pushed all of the photos aside except that of the appellant, stating that it was the only one she 'could not really rule out.' Finally, the prosecutrix consistently maintained that she was certain of her identification and that she was able to make such identification '[b]ecause I remember him from that night.' Under these circumstances, we conclude that the prosecutrix's in-court identification had an origin independent from the lineup. The appellant's first ground of error is overruled.

"By his second ground of error, the appellant complains that the trial court erred by allowing the prosecutrix to testify that she had previously identified the appellant in a pre-trial lineup because such pre-trial identification was the fruit of an illegal arrest. By this ground, the appellant does not challenge the in-court identification made of him by the prosecutrix. Rather, he argues that she should not have been allowed to recount the proceedings of a pre-trial lineup made possible by an illegal arrest. He further argues that the erroneous admission of such testimony cannot be said to be harmless due to the bolstering effect it had upon her in-court identification.

"In argument under this ground, the appellant essentially contends that he was subjected to a warrantless arrest, not authorized by any of the circumstances outlined in chapter 14 of the Texas Code of Criminal Procedure, and therefore illegal. Shortly after arrest, the appellant was placed in a lineup in which he was identified by the prosecutrix. It is this lineup that appellant claims was 'fruit' of the unlawful arrest and resultantly, that such testimony should have been suppressed.

"We deem it unnecessary to determine the legality of the arrest. Even assuming arguendo that the arrest was unlawful and that the subsequent lineup was fruit of the illegal arrest, we conclude that under the circumstances of this case, the admission of the challenged testimony was harmless error beyond a reasonable doubt. *See Gilbert v. California,* 388 U.S. 263, 274, 18 L.Ed.2d 1178, 87 S.Ct. 1951 [1957] (1967).

"As the court stated in *Beaupre v. State,* 526 S.W.2d 811, 814–15 (Tex.Cr. App.1975):

"[W]e find that the admission of the prosecutrix' testimony that she had identified the appellant in the lineup was harmless error beyond a reasonable doubt. When the totality of the circumstances is considered it is clear that the prosecutrix' in-court identification testimony was based upon her observation of the appellant during the one and one-half hours that she was with him at the time the offense was committed. The admission of the pros-

ecutrix' testimony that she identified appellant at the lineup added nothing that was calculated to cause the jury to return a different verdict than they would have returned if it had not been admitted.

"In our determination of the appellant's first ground of error, we concluded that there is ample evidence in the record to show that the prosecutrix's in-court identification testimony was the result of her observation of the appellant at the time of the offense and did not stem from the allegedly tainted lineup. Therefore, the admission of the prosecutrix's challenged testimony that she had identified the appellant at the lineup added nothing that was calculated to cause the jury to return a different verdict than it would have returned if the challenged testimony had not been induced. Consequently, we conclude that the admission of the prosecutrix's testimony that she had identified the appellant in the lineup is harmless error beyond a reasonable doubt. See Beaupre, 526 S.W.2d at 815. The appellant's second ground of error is overruled."

■ We conclude that the Court of Appeals reached the right result as to the disposition of appellant's first contention. See United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (198); Pichon v. State, 683 S.W.2d 422 (Tex.Cr.App. 1984).

In Crews the majority of the Supreme Court speaking through Justice Brennan stated:

"But in the present case the trial court expressly found that the witness' court room identification rested on an independent recollection of her initial encounter with the assailant, uninfluenced by the pretrial identifications, and this determination finds ample support in the record. In short, the victim's capacity to identify her assailant in court neither resulted from nor was biased by the unlawful conduct committed after she had developed that capacity." 445 U.S. at 473, 100 S.Ct. at 1251.

We have more difficulty with appellant's second contention that E___ Y___ was permitted to reinforce her in-court identification by testifying she had also identified appellant in a lineup almost one year after the offense when the lineup resulted from an illegal arrest made for the very purpose of obtaining such identification.

Appellant argues that identification was the most crucial issue in the case and highly contested, and that E___ Y___ was the only witness to place him at the scene of the crime. He notes she admittedly was crying and hysterical at the time of the offense and was emotionally upset; that she identified the co-defendant Vester after she had been hypnotized, although she claimed that she could have identified him (Vester) without such aid; that she gave a description of the appellant for a composite drawing nine months after the offense, but there were some discrepancies between it and appellant's actual appearance; that she had been unable to select appellant's photograph from a photographic spread shown her a few days before the lineup.

Appellant argues that thereafter he was arrested without a warrant on a public street across from the courthouse without probable cause or exigent circumstances and in violation of Chapter 14 of the Texas Code of Criminal Procedure and the federal and state Constitutions; that the arresting officer acknowledged the arrest was for the very purpose of a lineup; that the lineup followed shortly after the arrest, without any charges being filed, without being taken before a magistrate or being given any warnings.

■ We agree that the arrest of the appellant was without probable cause or exigent circumstances nor justified under any provision of said Chapter 14 of the Code of Criminal Procedure. Further, appellant did not consent to the arrest or lineup. Because the arrest was illegal, any evidence derived from the arrest would "absorb the taint" of that illegality and would therefore properly be subject to suppression. Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1949).

Only recently in *Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (March 20, 1985), the United States Supreme Court, in reaffirming *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), held that where there was no probable cause to arrest the petitioner, no consent to the journey to the police station, and no prior judicial authorization for detaining him, the investigative detention at the station for fingerprinting purposes violated the petitioner's rights under the Fourth Amendment as made applicable to the states by the Fourteenth Amendment, and the fingerprints thus taken were the inadmissible fruits of the illegal detention.

The Court wrote:

"And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home *or other place in which he is entitled to be* and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrest may constitutionally be made only on probable cause." (Emphasis supplied.)

In *Kinsey v. State*, 639 S.W.2d 486, 489 (Tex.App.—Texarkana 1982), Chief Justice Cornelius wrote:

"Ordinarily, an identification resulting from an illegal arrest is inadmissible. 3 La Fave, Search and Seizure, Sec. 11.4(g) (1978). But as Professor La Fave has pointed out, that result does not follow in all cases. Each case is to be judged on its own merits by an analysis employing the elements used by the United States Supreme Court in assaying the connection between an illegal arrest and a confession. The elements are (1) temporal proximity, (2) presence of the intervening circumstances, and particularly, (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)."

Here the lineup occurred very shortly after the illegal arrest. There were no intervening circumstances, and the arresting officer admitted the arrest was made for the very purpose of a lineup.

In *United States v. Edmons*, 432 F.2d 577 (2nd Cir.1970), it was held that when the police, not knowing the perpetrator's identity, make an arrest in deliberate violation of the Fourth Amendment for the very purpose of exhibiting a person before the victim and with the view toward having any resulting identification duplicated at trial, fulfillment of the primary illegality and the identification resulting must be excluded to serve deterrent purpose of the exclusionary rule.

We cannot agree with the Court of Appeals that the admission of the lineup identification was harmless error beyond a reasonable doubt. *Beaupre v. State*, 526 S.W.2d 811 (Tex.Cr.App.1975), cited by that court, is clearly distinguishable on the facts. We cannot say that the admission of the lineup identification added nothing that was calculated to cause the jury to return a different verdict than they would have returned if it had not been admitted.

The judgment of the Court of Appeals and the judgment of the trial court are reversed, and the cause is remanded to the trial court.

CAMPBELL, J., concurs in the result.

W.C. DAVIS, McCORMICK and WHITE, JJ., dissent.