Dana Lamark Dixon was certified to stand trial as an adult for the offenses of first degree burglary and first degree rape.[1] Dixon filed a motion to suppress which was denied after a hearing. He then pleaded guilty to both charges, while reserving his right to appeal from the denial of his motion to suppress. He was sentenced to twenty years' imprisonment on each conviction, to run concurrently, and ordered to pay court costs, $50 to the Victim's Compensation Fund, and $873.23 in restitution to the victim.
The underlying offenses occurred on the night of Sunday, March 19, 1989. Based on the victim's description of her attacker, the Montgomery Police Department issued a "be on the lookout" ("BOLO") for a black male, 17 to 18 years old, 5'8" in height, weighing 130 pounds, with a medium complexion, and wearing beige pants, a light gray shirt, and a green baseball cap with white letters. Sergeant Willie Echols made note of the information contained in this BOLO[2] at roll call on the following Wednesday morning (March 22).
Around 9:20 that morning, while on routine patrol, Sergeant Echols noticed the defendant standing on a corner approximately three blocks from where the crimes occurred. The defendant was wearing tan pants, white tennis shoes, a green windbreaker, and a green baseball cap with white letters. Echols testified at the suppression hearing that he did not immediately connect the defendant with the BOLO, but originally thought that, "due to the recent number of burglaries that [had occurred] in the area," the defendant might be the look-out for a burglary. He watched the defendant a few moments, then pulled up in front of him. The defendant *Page 893 
started to walk off, but Echols stopped him and asked him his name and why he was not in school. The defendant replied and told Echols he had been expelled from school. Echols patted the defendant down and found a three inch box cutter in his pocket. At some point in this encounter, Echols ascertained that the defendant was 15 years of age.
When Echols realized that the defendant matched the description in the BOLO in some respects, he used his car radio to contact an officer in the sex crimes division. This officer "advised [Echols] to transport [the defendant] down to headquarters." According to Echols, the defendant could hear this radio conversation. Echols then stated to the defendant that he "would like for [the defendant] to go to headquarters because he met the description of the suspect." According to Echols, he made the defendant aware that he was free to go and that he did not have to go to headquarters, and the defendant then "agreed to go." Echols did not advise the defendant of his rights, either under Miranda or Rule 11(A), A.R.Juv.P., prior to transporting him to police headquarters.
Echols and the defendant arrived at police headquarters around 9:30 a.m. Corporal R.G. Locklar testified that he asked the defendant his name and the name of his mother and her place of employment. Sometime between 9:30 and 10:00 a.m., Locklar telephoned the defendant's mother and "explained to her that her son was at police headquarters and he was there for questioning." Locklar stated that he informed the defendant's mother that she could come to police headquarters if she desired to do so. Around 10:15, Echols took the defendant to the juvenile division (physically located within the same building) and left him with two juvenile officers, Corporal Tim Fuentez and Investigator S.J. Livingston.
Livingston testified that Echols told him that the defendant was a possible rape suspect. Livingston "placed" the defendant in a "holding office," then read the defendant his rights using a juvenile rights form. The defendant said that he understood the form and signed it after reading the waiver paragraph aloud. This form is marked as having been suspended at 10:20 a.m. The defendant then stated that he wanted to speak to his mother.
Livingston did not ask the defendant any questions regarding the rape, but did question the defendant as to his mother's name and place of employment. Livingston then telephoned the defendant's mother and informed her that "her son had beenbrought down to police headquarters for questioning in reference to a possible rape." He further advised the defendant's mother that she needed to come down to police headquarters as soon as possible.
Livingston relayed the above information to Fuentez. Although he did not question the defendant at this time, Fuentez "advised" the defendant that he was there because he was a suspect in a rape case, "that he still had on basically the same clothes as the rapist did." Fuentez also "advised" the defendant that he would be in a line-up at the Youth Facility. Shortly thereafter, Fuentez transported the defendant to the Youth Facility. Upon their arrival at the Youth Facility at around 11:30 a.m., Fuentez "placed" the defendant in the visitation room. Fuentez learned from the Youth Facility personnel that the line-up would not be conducted until 12:30 p.m. Fuentez testified that he then "released [the defendant] into the custody of the Youth Facility until that time." The prosecutor asked if this meant the defendant "was simply left in the visitation room" and Fuentez replied, "Yes." The visitation room was described by Fuentez as having only "one door in and one door out."
Upon placing or leaving the defendant at the Youth Center, Fuentez went to lunch. When he returned, he saw the defendant in the visitation room with his parents and they appeared to be talking. Some ten or fifteen minutes later, Fuentez went to the visitation room and introduced himself to the defendant's parents. He took them to the in-take office where he informed them that the defendant was a suspect in a rape and "advised" them that the defendant *Page 894 
would be a participant in a line-up. After stating that he would apprise the parents of the results after the line-up, Fuentez returned to the visitation room to take the defendant to the line-up.
At the line-up, the victim tentatively identified the defendant as her attacker. Immediately after the line-up, Fuentez "went back [to the visitation room] with Detective Scott and interviewed [the defendant]." Prior to questioning the defendant, Fuentez advised him of his rights as a juvenile. According to Fuentez, the defendant did not ask for his parents or a lawyer to be present, but waived his rights and confessed to breaking into the victim's residence and raping her. After Fuentez had obtained this confession, he went to the area where defendant's parents were waiting and "advised them that [the defendant] was tentatively picked out of the line-up and also that he admitted to the offense." Fuentez also "advised" the defendant's parents "that [the defendant] was going to be taken to headquarters to take a statement from him and that they could leave."
The defendant was then transported back to headquarters, where he was again informed of his juvenile rights. Fuentez testified that the defendant again waived these rights and signed a waiver of rights form. The defendant then gave another statement in which he again admitted committing the crimes charged. This statement was tape recorded and later transcribed.[3]
The defendant testified at the suppression hearing that Sergeant Echols told him that he was under arrest and handcuffed him prior to taking him to police headquarters. He maintained that he asked for his mother when he was originally taken to headquarters by Echols, but that he was not permitted to see his parents until after the line-up had been conducted and he had given the first confession to Fuentez and Scott. He testified that he asked to talk to his mother again before giving the second statement at headquarters, but was not permitted to do so. On cross-examination the defendant admitted that he was not under the influence of drugs or alcohol at the time he was questioned and that he was familiar with the juvenile court system and his rights as a juvenile.
Ron McKitt, a counselor at the Youth Facility, was called as a witness by the defendant. McKitt testified that he saw the defendant's father at the Youth Facility on the day in question. The father was talking to a police officer and, apparently in response to the officer's statement that an attorney would be appointed for the defendant, adamantly stated that he would hire an attorney for the defendant. McKitt characterized the father as "vociferous" in this matter, but could not say what time of day this exchange occurred. Rhonda Beasley, an intake officer at the Youth Facility, testified that she remembered seeing both the defendant and his parents at the facility that day, but did not recall seeing them together. The defendant's parents did not testify.
 I
The defendant contends that he was arrested without probable cause in violation of the Fourth Amendment. The State answers that the defendant was not arrested; he voluntarily agreed to accompany Sergeant Echols to police headquarters.
It is well settled that "a voluntary trip to the police station for questioning does not implicate the [F]ourth [A]mendment [and its attendant requirement of probable cause]."Cox v. State, 489 So.2d 612, 618 (Ala.Cr.App. 1985) (quotingUnited States v. Webster, 750 F.2d 307, 321 (5th Cir. 1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 2341,85 L.Ed.2d 855, 856 (1985)). However, "in determining whether an individual has been seized or has voluntarily chosen to undergo police custody and interrogation, the totality of the circumstances must be considered." Bradley v. State,494 So.2d 750, 758 (Ala.Cr.App. 1985), affirmed, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, *Page 895 94 L.Ed.2d 699 (1987). Moreover, the burden is on the State to prove that the defendant acted voluntarily. Id.
Whether the defendant initially accompanied Echols on a voluntary basis was in dispute. Even accepting that the defendant did voluntarily go to police headquarters, the totality of the circumstances, as shown by the State's evidence, do not indicate that he remained there on that basis. What begins as a voluntary trip to the police station may escalate into an arrest, triggering the requirement of probable cause. Cf. United States v. Sharpe, 470 U.S. 675, 685-86,105 S.Ct. 1568, 157475, 84 L.Ed.2d 605 (1985) (recognizing that a stop under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889 (1968), may, under some circumstances, cease to be a permissible investigatory stop and become a full-scale arrest);Hayes v. Florida, 470 U.S. 811, 815-16, 105 S.Ct. 1643, 1646,84 L.Ed.2d 705 (1985) ("[t]here is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments").
An individual is arrested when his "freedom of movement has been curtailed such that a reasonable, ordinary person in the defendant's or suspect's position would believe that he is not free to leave." State v. Phillips, 517 So.2d 648, 650
(Ala.Cr.App. 1987). "At what point in time an arrest is accomplished is usually a question of fact." McLemore v. State,562 So.2d 639, 643 (Ala.Cr.App. 1989). In determining whether or when an arrest occurred, this Court is to consider "all the circumstances surrounding the incident." Williams v. State,527 So.2d 764, 769 (Ala.Cr.App. 1987).
The facts in this case show that the defendant, a juvenile, initially arrived at headquarters around 9:30 a.m. He had some contact with one officer who called the defendant's mother and informed her that the defendant was at headquarters for questioning. Around 10:15, he was "placed" in a "holding office" by another officer. This officer also contacted the defendant's mother and informed her that the defendant "hadbeen brought down to police headquarters for questioning." Yet another officer "advised" the defendant that he would be a participant in a line-up. The defendant was then transported to the Youth Facility and "placed" in the visitation room, where he remained until the lineup was conducted at 12:30. Whether he was actually in the custody of the Youth Facility or merely left there while Fuentez went to lunch, there was no testimony that the defendant was told that he was free to leave at that point, nor was there any other evidence giving rise to the inference the defendant would have thought that he was free to leave. In fact, all indications are to the contrary.
In Darden v. State, 571 So.2d 1272 (Ala.Cr.App. 1990), the defendant argued that he was arrested without probable cause when he was transported to the police station in handcuffs. One Officer Benson testified that the defendant voluntarily agreed to accompany him to the police station to talk with a Sergeant Quinn. Officer Benson handcuffed the defendant, explaining that he was required to do so to transport the defendant to the precinct. At the precinct, the defendant was fingerprinted and his prints were subsequently found to match prints lifted from several crimes scenes. Shortly thereafter, the defendant was formally arrested and confessed. The defendant did not testify at the suppression hearing, leaving the State's evidence uncontroverted. Acknowledging that the issue was "extremely close," id. at 1275, we found that the defendant acted voluntarily prior to the formal arrest:
 "Although the fact that defendant was handcuffed is a weighty factor in the analysis of whether he was seized or voluntarily chose to undergo police custody, it diminishes in importance when viewed in light of later circumstances.
 "Those later circumstances include the following facts: the handcuffs were removed upon his arrival at the precinct; he was left unattended and unrestrained *Page 896 
on four occasions, two of which presented good opportunities to leave or escape; Sgt. Quinn preceded every investigative action he took [obtaining fingerprints and a photograph] with a request or an inquiry whether the defendant 'minded' submitting to the procedure; and Sgt. Quinn complied with the defendant's wishes regarding being taken home, to work, or to see his mother. Particularly significant in this regard are the visit to the bank [where the defendant's mother was employed], during which Quinn told the defendant it 'wasn't necessary' for Quinn to accompany the defendant inside, and the stop at the fingerprint identification section, during which Quinn left the defendant totally unattended and unrestrained [in the car] while he, Quinn, delivered the print cards to [the fingerprint expert]. Had the defendant felt restrained on either occasion, he could have gone into the bank alone or left the car. In either instance, he might have eluded Quinn altogether. While events at the precinct, the bank, and the unattended car cannot relate back to 'cure' an earlier involuntary detention, they can shed light on what was likely to have been the perception of a reasonable person in the defendant's position from the beginning." Id. at 1277.
Where Darden was "extremely close," the facts in this case clearly cross the line dividing voluntary conduct from actual arrest. As noted above, the burden is on the State to prove that a defendant acted voluntarily. In this case, our review of the circumstances existing after the defendant's arrival at headquarters, as shown by the State's own evidence, leads to the inescapable conclusion that the defendant did not remain there voluntarily. With the exception of Echols, none of the officers who had contact with the defendant testified that he was informed that he was free to leave at any time. He clearly was not asked if he would participate in the line-up, he was "advised" that he would do so. He was not asked whether he would go to the Youth Facility, he was simply transported there. There is no indication that, during the approximately three hours that passed between the defendant's initial arrival at headquarters and the line-up, the defendant was ever left in a position where he could have simply walked away. Moreover, the very conduct and comments of the officers, aside from Echols, indicate that they did not consider the defendant to be at the station voluntarily. We note that the defendant was advised of his rights after he had been at headquarters almost an hour. "The police are required to give Miranda warnings only 'where there has been such a restriction on a person's freedom as to render him "in custody."' [Oregon v. Mathiason,429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977)]."California v. Beheler, 463 U.S. 1121, 1124, 103 S.Ct. 3517,3519, 77 L.Ed.2d 1275 (1983). See also Rule 11(A), A.R.Juv. P. ("[w]hen the child is taken into custody, he must be informed of the following rights by the person taking him intocustody. . . .") (emphasis added).
It is clear that what may have begun as a "voluntary trip to the station house" became non-consensual in nature at some point after the defendant's arrival at headquarters. The exact moment that the defendant was arrested need not be determined because it is apparent that the defendant was actually arrested at a time prior to the line-up. Having made that determination, this Court must now ascertain whether probable cause for his arrest existed at that time. See Davis v. State,507 So.2d 1023, 1025 (Ala.Cr.App. 1986). We find that it did not.
Probable cause to arrest requires the "knowledge of facts and circumstances which are reasonably trustworthy and which would lead a prudent man to believe that the accused had committed the offense [for which he is arrested]." Blanco v. State,515 So.2d 115, 119 (Ala.Cr.App. 1987). It is axiomatic that "[p]robable cause deals with probabilities, not legal technicalities. It is grounded upon those practical, factual considerations of everyday life upon which reasonable and prudent men act. Brinegar v. United States, 338 U.S. 160,69 S.Ct. 1302, 93 L.Ed.2d 1879 (1948)." Carter v. State,405 So.2d 957, 959 (Ala.Cr.App.), *Page 897 
cert. denied, 405 So.2d 962 (Ala. 1981). "Probable cause does not require an officer to compile an airtight case against a suspect." Williams v. State, 440 So.2d 1139, 1145 (Ala.Cr.App. 1983). However, a mere suspicion on the part of the officer that the suspect committed a crime will not suffice. Moore v.State, 415 So.2d 1210, 1216 (Ala.Cr.App.), cert. denied,459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982). Whether probable cause existed for a particular arrest "must be determined from the facts of each case." Waldrop v. State,462 So.2d 1021, 1029 (Ala.Cr.App. 1984), cert. denied,472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985).
The only facts known to the officers as disclosed by the record before us are that (1) a rape and burglary had been committed; (2) the victim had given a general description of the attacker's physical appearance and apparel to the police; and (3) three days after the commission of the crimes, the defendant, who matched in some respects the general description of the attacker, was seen in the vicinity of the crimes. The defendant was a teenaged black male wearing two items of clothing contained in the general description given by the victim: tan pants and a green baseball cap with white letters. At the time of his arrest, he was also wearing a green windbreaker and the line-up information sheet discloses that he was 5'6" and weighed 169 pounds. We note that these particulars do not match the general description. There was no testimony as to the defendant's complexion.
We recognize that facts sufficient to establish probable cause may arise from the collective knowledge of the officers involved. Ex parte Boyd, 542 So.2d 1276, 1284 (Ala.), cert. denied, 493 U.S. 883, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989);Callahan v. State, 557 So.2d 1292, 1302 (Ala.Cr.App.), affirmed, 557 So.2d 1311 (Ala. 1989). In this case, however, there was absolutely nothing in the record to indicate that any officer knew any facts other than those set forth above. Assuming, without deciding, that the initial stop by Sergeant Echols was proper under Terry v. Ohio, 392 U.S. 1,88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), it is clear that Echols learned nothing during that stop which would go toward establishing probable cause. The information gleaned by Echols during this stop amounted to the defendant's name and the facts that he had been expelled from school and that he was carrying a box cutter. Because the victim did not know her attacker, the defendant's name could not assist in establishing probable cause. The attack did not occur during school hours, nor was a box cutter used in the commission thereof. Consequently, the facts that the defendant had been expelled and was carrying a box cutter added nothing to the establishment of probable cause.
Reduced to the simplest of terms, the facts within the knowledge of the officers at the time of the arrest were that the defendant matched an extremely general description of the attacker on some very common points (teenaged black male, tan pants, green baseball cap) and was seen in the area of the crimes three days afterwards. Given the extremely general nature of the description, the rather generic points on which the defendant matched that description, and the time lapse involved, we are simply unable to conclude that prior to the line-up probable cause existed for the defendant's arrest. Under the facts presented by this record, a prudent man would not have believed that the defendant had committed the burglary and rape at the time he was actually arrested therefor.
"[A]n arrest may not be made upon a general description when the circumstances, including the lapse of time and size of the area being searched, are such that more than one person would likely fit that description." LaFave, "Street Encounters" andthe Constitution: Terry, Sibron, Peters, and Beyond, 67 Mich. L.Rev. 39, 80 (1968) (footnote omitted). Illustrative of this principle, and involving facts similar to the case at bar, isUnited States v. Short, 570 F.2d 1051 (D.C. Cir. 1978). In that case, patrol officers received a BOLO over the radio for two burglary suspects. One suspect was described as a black male, "approximately 18 to 19 years old, 5'9" to 5'10" tall, 145 to 155 pounds, *Page 898 
with a short Afro-bush haircut and dark complexion . . . wearing a camel-colored, waist-length leather jacket and blue trousers." Id. at 1053. The other suspect was described only as a black male. Several minutes after receiving the BOLO, the officers stopped two black males, one of whom, the defendant Short, "had a short bush haircut and [was wearing] a waist-length, brown-colored jacket and blue pants." Id.
(footnote omitted). This stop occurred approximately one and one-half blocks from the scene of the burglary. A search of Short's person yielded a bag of heroin and he was subsequently convicted of possession with intent to distribute. In determining that the search was not incident to a lawful arrest, the District of Columbia Circuit Court stated:
 "In this case we do not find the probable cause required to justify an arrest for burglary. We concede that the case is a close one, but the description received over the police radio fits many young people in that area of Washington. . . .
 "The probable cause requirement is the chief bulwark against 'investigatory arrests' proscribed by the Fourth Amendment. See Davis v. Mississippi, 394 U.S. 721, 726-27, 89 S.Ct. 1394, 22 L.Ed.2d 676
(1969). It is meant to minimize the possibility of subjecting innocent people to the harassment and embarrassment of involuntary detention and a probing search of person or effects. Here the proffered grounds for probable cause were insufficient to narrow the number of suspects to a level tolerable under the Fourth Amendment."
Id. at 1054 (emphasis added).
In People v. Mickelson, 59 Cal.2d 448, 380 P.2d 658,30 Cal.Rptr. 18 (1963), an officer received information from other officers at the scene of a robbery that "the robber was a fairly tall white man of large build with dark hair who was wearing a red sweater and armed with a .45 automatic."59 Cal. 2d at 452, 380 P.2d at 661, 30 Cal.Rptr. at 21. Some ten to fifteen minutes later the officer stopped a station wagon carrying two people because "[t]he driver [one Zauzig] appeared to be a large white man with dark hair wearing a red sweater or jacket." Id. This stop occurred some six blocks from the scene of the robbery. The officer searched the car and found evidence connecting the defendants with another crime, for which they were convicted. In determining that the warrantless search of the car was not justified as incident to a lawful arrest, the California Supreme Court stated:
 "It was not unreasonable for the officer to stop Zauzig's car for investigation and to take reasonable precautions for his own safety. He did not have probable cause, however, to arrest Zauzig for robbery. There could have been more than one tall white man with dark hair wearing a red sweater abroad at night in such a metropolitan area [Burbank]. Although Zauzig was in the vicinity of the robbery, he was not observed until some twenty minutes after it occurred when he was driving toward the scene of the crime, not away from it."
59 Cal.2d at 454, 380 P.2d at 662, 30 Cal.Rptr. at 22
(emphasis added). See also, United States v. Lewis,486 A.2d 729 (D.C. Cir. 1985) (probable cause necessary for arrest not established by fact that defendant matched some aspects of victim's description of assailant).
Although much more time elapsed between the crime and the arrest, the same result was reached by the Texas Court of Criminal Appeals in Hill v. State, 692 S.W.2d 716 (Tex.Cr.App. 1985). There, a witness to a murder gave police a description of the two murderers. Some nine months after the offense, a composite drawing of one of the murderers was completed based on the witness' description. Approximately a year after the offense, investigating officers were approached by the defendant regarding the arrest of one of the alleged murderers. The officers had no previous knowledge of the defendant, but they "decided he bore a resemblance to the composite drawing," noting that he "wore sloppy clothes and his shirt was unbuttoned to the waist just as [the witness] had described."Id. at 720. The officers displayed to the witness a photographic *Page 899 
array containing a photograph of the defendant which had been taken after he had been in a fight and his face was swollen and bruised. The witness said she "couldn't rule [the photograph of the defendant] out, but she made no positive identification."Id. Nevertheless, the defendant was arrested and a line-up was conducted at which the witness positively identified him as the other murderer. Apparently deeming that the issue required no discussion, the Texas Court of Criminal Appeals simply held that "the arrest of the [defendant] was without probable cause." Id. at 722. Cf. Hayes v. Florida, 470 U.S. at 812, 105 S.Ct. at 1645 (noting that while the defendant "generally fit the description of the assailant" and was considered a "principal suspect," there was no probable cause for his arrest).
This Court recognizes that Montgomery is a relatively large, metropolitan city. It is not inconceivable that more than one teenaged black male matching the general physical description of the rapist and wearing tan pants and a green cap, neither of which is particularly distinctive, could be found within the general vicinity of the crimes at any given time. We readily distinguish this case from cases in which the fact that the defendant matched the description of the perpetrator,coupled with other pertinent facts, established probable cause.See, eg., Cotton v. State, 481 So.2d 413 (Ala.Cr.App. 1985) (probable cause supplied by information that a warrant for his arrest was outstanding obtained through NCIC computer after defendant was stopped because he matched the description of person issuing worthless checks); Turk v. State, 53 Ala. App. 106, 298 So.2d 37 (1974) (probable cause supplied by facts that defendant matched victim's description as to age, height, weight and dress, particularly in that he was wearing a black floppy hat, and the victim had positively identified the defendant from a photographic army). Further, we do not mean to imply that the fact that a defendant matches the description of the perpetrator can never, alone, establish probable cause. In this case, however, due to the generality of the description, the extremely common points on which the defendant matched this description, and the time lag involved, probable cause was not established.
 II
The defendant contends that the line-up identification and his confessions were fruits of his illegal arrest and should have been suppressed.
Where an arrest is determined to be illegal, a subsequent confession may be admissible if "the taint of the arrest" is sufficiently attenuated. Brown v. Illinois, 422 U.S. 590, 592,95 S.Ct. 2254, 2256, 45 L.Ed.2d 416 (1975). See generally, 4 W. LaFave, Search and Seizure § 11.4(b) (2d ed. 1987). Factors to be considered in determining whether the arrest is sufficiently attenuated are (1) the temporal proximity of the arrest and the confession; (2) whether there were any "intervening circumstances" occurring between the arrest and the confession; and (3) the purpose and flagrancy of police misconduct. Dunawayv. New York, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259,60 L.Ed.2d 824 (1979); Brown v. Illinois, 422 U.S. at 603-04,95 S.Ct. at 2261-62. The focus in making this determination is on "the causal connection between the illegality and the confession."Brown v. Illinois, 422 U.S. at 603, 95 S.Ct. at 2261. The same analysis is employed in determining whether an illegal arrest is sufficiently attenuated from a line-up held after that arrest. 4 W. LaFave, Search and Seizure § 11.4(g) at 433.
As noted in Part I, it is unclear exactly when the defendant was actually arrested. However, we know that his first contact with Sergeant Echols occurred around 9:30 a.m. The line-up was held around 12:30 and the defendant's first confession was obtained almost immediately thereafter. At most, there was a three-hour interval between the arrest and the line-up. Because the confessions followed almost immediately after the line-up, we find it very difficult to separate the two for attenuation purposes. We observe that confessions have been deemed to be fruit of an illegal arrest where the time interval *Page 900 
was as little as two hours, Brown v. Illinois; Dunaway v. NewYork, and as much as six hours, Taylor v. Alabama,457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982).
The record does not disclose exactly what occurred during the time between the arrest and the line-up. While it does not appear that the defendant was questioned, he was shuttled between several different police officers and transported to another location. He was confronted at least once with the fact that he was dressed similarly to the rapist. He may have been fingerprinted.[4] The defendant testified that he was not permitted to talk to his parents until after the line-up and the first confession. The only prosecution witness to contradict this was Corporal Fuentez, and his testimony showed only that the defendant was with his parents for ten to fifteen minutes prior to the line-up.[5] It is uncontroverted that the defendant's parents were not present at the line-up or when either of the defendant's confessions were given. Moreover, neither the defendant nor his parents were asked whether he would participate in the line-up; they were all simply "advised" that he would do so.
In Taylor v. Alabama, 457 U.S. at 69192,102 S.Ct. at 2667-68, the Supreme Court held that the fact that the defendant was permitted to visit with his girlfriend and a male companion for five or ten minutes prior to confessing was not an intervening circumstance. In light of that case, we fail to see how this defendant's ten or fifteen minute visit with his parents can be deemed an intervening circumstance, especially with regard to the line-up. It is clear that the defendant was not a voluntary participant in the line-up. As noted above, both the defendant and his parents were "advised" that he would participate in it. For this reason it is clear that the line-up cannot be viewed as an intervening circumstance between the arrest and the confessions.
The fact that the defendant was given the "juvenileMiranda warnings" in the form required by Rule 11(A) while at headquarters and again immediately preceding his confessions is not particularly significant. In Brown v. Illinois and Dunawayv. New York, the Supreme Court clearly established that the fact that Miranda warnings were given and understood "is not by itself sufficient to purge the taint of an illegal arrest."Taylor v. Alabama, 457 U.S. at 690, 102 S.Ct. at 2667.
The arrest was clearly for investigatory purposes. It may even be fairly inferred from the State's evidence that the arrest was for the sole purpose of conducting a line-up. In any event, the facts of this case are very similar to those inBrown v. Illinois, Dunaway v. New York, and Taylor v. Alabama.
In each of those cases, the defendant "was arrested without probable cause in the hope that something would turn up, and he confessed shortly thereafter without any meaningful intervening event." Taylor v. Alabama, 457 U.S. at 691, 102 S.Ct. at 2667. Here, the defendant was also identified in a line-up. See Hillv. State, 692 S.W.2d at 722-23 (line-up identification held to be inadmissible as fruit of the illegal arrest discussed in Part I above). We see no discernable difference between Taylorv. Alabama, which also involved the Montgomery Police Department, and this case. Thus, we conclude that the lineup identification and the defendant's confessions were due to be suppressed.
 III
Even if the arrest were sufficiently attenuated from the confession, we cannot conclude that the confession was not induced.
A confession is deemed involuntary and may not be admitted at trial unless the *Page 901 
State presents sufficient evidence to show both that the confession was voluntary and that the proper Miranda warnings, or in the case of a juvenile, the Rule 11(A), A.R.Juv.P., warnings, were given and understood. Carr v. State,545 So.2d 820, 822 (Ala.Cr.App. 1989). The Supreme Court elaborated on these "two distinct dimensions" of a Fifth Amendment waiver inMoran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141,89 L.Ed.2d 410 (1986):
 "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived."
(Emphasis added.)
With regard to the voluntariness dimension, "[t]he test is whether the confession was ' "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." ' Bram v. United States, 168 U.S. 532, 542-543,18 S.Ct. 183, 187, 42 L.Ed. 568 (1897); see Brady v. UnitedStates, [397 U.S. 742, 753, 90 S.Ct. 1463, 1471, 25 L.Ed.2d 747
(1970)]." Hutto v. Ross, 429 U.S. 28, 30, 97 S.Ct. 202, 203,50 L.Ed.2d 194 (1976). The voluntariness of the confession, similar to the voluntariness of a consent, must be established by "clear and positive testimony." King v. State,521 So.2d 1042, 1046 (Ala.Cr.App. 1987), cert. denied, 521 So.2d 1050
(Ala. 1988).
The defendant gave the following testimony at the suppression hearing:
 "Q. [By defense counsel] When they took you down to the Youth Facility, after the line-up, tell the court what Detective Scott and Corporal Fuentez told you back there in that visitation room?
 "A. When he came back and told me she had identified me and that they had my fingerprints all over the place, and they told me the juvenile — I forgot the name — He told me I needed to make a confession; and if I don't, he would turn me over to the adult detective.
 "Q. Was that Corporal Fuentez, the Juvenile Youth Aid Officer, that told you that?
"A. Yes.
"Q. All right.
 "A. He said if I confess, he could keep me as a juvenile, but if I don't, he would turn me over to the adult detective.
 "Q. Was that Detective Scott that he was referring to?
"A. Yeah. He can have me go to prison."
(Emphasis added.)
Detective Scott was called as a defense witness. Defense counsel asked him, "Did you hear Corporal Fuentez tell [the defendant] that if he made a statement, he could keep him inthe juvenile system, he would be treated as a juvenile?" (Emphasis added.) Detective Scott replied, "I don't remember the exact statement. Yes, I remember something to that extent." (Emphasis added.) On subsequent questioning by the prosecutor, Scott stated, "Corporal Fuentez introduced me as the officer that handled the initial investigation. With him being a juvenile, I would not be handling it. I was there strictly as the initial investigator." However, Scott never denied that Fuentez told the defendant that he would be treated as a juvenile if he confessed.
Defense counsel several times questioned Corporal Fuentez concerning the alleged statement. Corporal Fuentez's answer was that he did not recall whether or not he had made such a statement. However, in response to subsequent questioning by the prosecutor, Fuentez denied that he made the statement or that he had offered the defendant any other inducement to confess.
"Any, the slightest menace or threat, or any hope engendered or encouraged that the prisoner's case will be lightened, meliorated, or more favorably dealt with if he will confess; either of these is enough to *Page 902 
exclude the confession thereby superinduced." Womack v. State,281 Ala. 499, 507, 205 So.2d 579, 587 (1967). Accord, O'Tingerv. State, 342 So.2d 1343, 1345 (Ala.Cr.App. 1977). Whether Fuentez's alleged statement is viewed as holding out the hope of the more lenient treatment as a juvenile or the threat of harsher treatment as an adult, it is clear that the statement is sufficient to render the confessions involuntary. Roger E.G.v. Kirkpatrick, 53 Cal.App.3d 198, 202, 125 Cal.Rptr. 625,628 (1975) (juvenile defendant's confession rendered involuntary by interrogating officers' statements that he would be certified as an adult if "he did not talk" and that they would help him secure parole if he did, as these statements "establishe[d] an implied, if not express, threat of harsher punishment if [the defendant] did not confess, and an implied, if not express, promise of the possibility of more lenient treatment if he did"); State v. Biron, 266 Minn. 272, 282,123 N.W.2d 392, 398-99 (1963) (confession of 18-year-old defendant who was technically beyond the age for juvenile offender treatment rendered involuntary where interrogating officers implied that he would be treated as a juvenile if he confessed as the "statements and representations were persuasive and could only have had the effect of implanting in the defendant's mind the hope that he would be treated as a juvenile offender"). Cf. Felder v. State, 17 Ala. App. 458, 85 So. 868,869-70 (1920) (where deputy testified that he told juvenile defendant that "'[i]f you get me the ring, I will turn you over to the juvenile people' — and she went around the house and got it," the defendant's action of giving ring to deputy amounted to a confession which was inadmissible in that it "was shown not to be voluntary").
Where, on the issue of the voluntariness of a confession, evidence offered by the defendant conflicts with that offered by the State, it creates a question of fact for the trial judge. Callahan v. State, 557 So.2d 1292, 1299, affirmed,557 So.2d 1311 (Ala. 1989). The trial judge made no specific findings of fact with regard to the voluntariness of the confessions. Inasmuch as he denied the defendant's motion to suppress, however, we can presume that he found the confessions to be voluntary. A trial judge's finding of voluntariness need only be supported by a preponderance of the evidence, Seawrightv. State, 479 So.2d 1362, 1367 (Ala.Cr.App. 1985), and "will not be disturbed on appeal unless found to be manifestly contrary to the great weight of the evidence." Malone v. State,452 So.2d 1386, 1389 (Ala.Cr.App. 1984).
This is one of the rare cases in which this Court cannot conclude that the trial judge's finding was supported by a preponderance of the evidence. Here, not only is the evidence offered by the defendant and the State in conflict, but the State's own evidence is internally inconsistent. Corporal Fuentez first testified that he could not remember whether or not he had told the defendant that the defendant would be treated as a juvenile if he confessed. Later, Fuentez denied making the statement. However, the testimony of the other officer present during the confession supports the defendant's testimony as to what occurred. The State's evidence on the voluntariness issue was simply not "clear and positive." Cf Exparte Johnson, 522 So.2d 234, 237 (Ala. 1988) (statement held involuntary where trooper "could not affirmatively and unequivocally testify that he did not, at the time of the interview, tell [the defendant] that the accident report would not be used in Alabama, as [the defendant] asserts that he did"); McLallen v. Wyrick, 498 F. Supp. 137, 138 (W.D.Mo. 1980) (where defendant testified that the prosecuting attorney induced him to make a confession and the sheriff's testimony corroborated this, federal habeas corpus court was "constrained to believe this testimony," even though prosecuting attorney denied making the alleged statements).
For the reasons stated above, the judgment of the circuit court is reversed and this cause remanded for further proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
All Judges concur.
[1] The certification proceedings are not a part of the record before this Court and no issues related to that proceeding are raised in this appeal.
[2] Echols testified that his notes from the BOLO described a black male, 16 to 18 years of age, 5'6" to 5'8" in height, weighing 130 pounds, with short cropped hair and a medium complexion, and wearing tan pants, a gray or white tee-shirt, and a green baseball cap with white letters. However, the actual BOLO is part of the record before this Court (State's Exhibit 7) and contains only the information we have set forth above.
[3] Fuentez indicated that the defendant was taken back to headquarters for this second statement because the Youth Facility did not have taping equipment.
[4] As noted in Part III below, the defendant testified that Fuentez told him after the line-up that his "fingerprints were all over the place." This testimony was not refuted in any way by the State.
[5] We note that the defendant's mother was informed in both telephone calls that the defendant was at police headquarters, and apparently was not informed that he was being transferred to the Youth Facility. There was no testimony as to when the parents arrived at the Youth Facility. *Page 903